[Crim. No. 21962. Feb. 25, 1988.]

THE PEOPLE, Plaintiff and Respondent, v.
ERIC B. KIMBLE, Defendant and Appellant.

**Counsel**

Frank O. Bell, Jr., State Public Defender, under appointment by the Supreme Court, Jill Ishida, Donald L. A. Kerson and Larry Pizarro, Deputy State Public Defenders, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, Gary Hahn, Norman H. Sokolow and Robert F. Katz, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

LUCAS, C. J.—This is an automatic appeal (Pen. Code, § 1239, subd. (b))[1] from a judgment of death imposed under the 1977 death penalty law. (Former § 190 et seq., Stats 1977, ch. 316, § 4 et seq., pp. 1256-1262.) Defendant raises numerous claims of error relating to the guilt, special circumstance and penalty phases of the proceedings. We conclude that the judgment should be affirmed in its entirety.

## I. FACTS

In the afternoon of August 12, 1978, Harry and Avone Margulies were killed in their home in the Doheny Estates neighborhood in Los Angeles. That same evening, Beverly Stereo Electronics, a retail stereo equipment store owned by Harry, was burglarized and numerous pieces of stereo equipment were taken. The crimes of which defendant was convicted relate to these two incidents. We briefly summarize the facts as disclosed by the record.

### A. The Crimes at the Victims' Residence

About 1:30 p.m. on the day of the murders, the Margulies' next door neighbor discovered a young man with a black briefcase hiding in the bushes outside of the Margulies' residence. The man told the neighbor that he was hiding from some people who were after him, but the neighbor did not see anyone around. The neighbor told him to leave the area and the man walked around the corner and out of view. At trial, the neighbor identified defendant as the person he had seen outside of the Margulies' home that day.

The day in question was a Saturday, and, as was his custom, Harry worked in his store in the morning and returned to his home in the early afternoon. His son testified that he telephoned his father at home between 3 and 4 p.m. and that nothing during their conversation suggested that anything unusual had occurred or was occurring at the house.

---

[1] Unless otherwise specified, all references are to the Penal Code.

Both the Margulies' home and their stereo store had burglar alarm systems which had been installed and were monitored by Pacific Alarm. Sometime after 4 p.m., the burglar alarm at the Margulies' residence went off; the alarm was set to sound both in the house and at Pacific Alarm's offices. Shortly thereafter, the Margulies' daughter, who worked at her father's store, received a call from the alarm company informing her that the alarm at the house had been triggered. After telephoning the residence but receiving no answer, she drove to the home. She found the front door ajar, and, as she started to enter the house, saw her mother's dead body on the floor. She ran to a neighbor's home and called the police.

On their arrival, the police found the dead bodies of Avone and Harry in the front hallway. The eyes and mouths of both victims had been covered with adhesive tape, and both had had their hands secured behind their backs—Avone with cord and Harry with a pair of handcuffs. Harry's body was found fully dressed but Avone's was nude. Each victim had died from a single gunshot wound to the chest area fired from a .45 caliber handgun. Later laboratory tests found semen in Avone's vagina.

The police found a number of items in the house that other family members testified had not been there before the commission of the crimes: a black briefcase with a box of ammunition on the kitchen floor, and a bicycle cable and lock in one of the bedrooms.

Neither Avone's purse nor Harry's wallet had been stolen during the incident. One of the investigating officers testified, however, that he could not recall whether any money had been found in Harry's wallet at that time. Family members reported that a set of Harry's keys—which included all of the keys to his stereo store—had apparently been taken because they were not in their usual location on the top of a buffet in the dining room.

B. *The Stereo Store Burglary*

The sales manager at Beverly Stereo testified that on that same day, August 12, he locked the store at 6 p.m. or 6:15 p.m. and set the burglar alarm. At 8:05 p.m., a police officer received a radio call directing him to investigate the activation of a silent burglar alarm at Beverly Stereo that had apparently been reported by the alarm company. When he arrived at the store, the officer found all of the doors locked and observed nothing out of the ordinary; after investigating for five or ten minutes, he left.

Several hours later, between 11 and 12 that night, the store's burglar alarm system again activated a signal at the alarm company's offices. The alarm was tripped and reset a number of times, indicating that someone was

walking around the premises, opening and closing the store doors. The police were again notified, and this time the report of a possible burglary at the store was directed to the detectives who were investigating the Margulies' murders. The detectives went to the store where they were met by an employee from the alarm company who had keys to the building. There was no sign of a break-in or forced entry, but when the detectives entered with the alarm company employee it was evident that the store had been ransacked. A later inventory revealed that many pieces of stereo equipment had been taken from the store that night.

### C. *The Investigation*

On Monday, August 14, two days after the burglary, a couple who had been driving in the vicinity of Beverly Stereo between 11:15 and 11:30 p.m. on the night of the burglary, reported to the police that they had observed unusual activity outside the store at that time. The couple stated that they had seen a car driving slowly out of an alley behind the store, with someone running alongside the car holding several boxes that were resting on its hood. After turning out of the alley, the car stopped behind another car which was parked directly across from the stereo store. Because this activity appeared suspicious, the couple wrote down the license plate number of the car that had come out of the alley. They gave this information to the police on August 14.

By running a check on the license number, the police determined that the car was owned by Ortez Winfrey (Ortez).[2] The police sought and secured a warrant to search Ortez's home, and executed it on the morning of August 16, arresting Ortez and finding a large number of stereo equipment components and boxes which had been taken from Beverly Stereo. Later that morning, while in custody, Ortez gave a statement to the police concerning his participation in the burglary.

According to Ortez's statement, defendant, a long-time friend, had approached him late in the afternoon of August 12 to ask if Ortez would help defendant remove some stereo equipment from the Beverly Stereo store. Ortez said that defendant showed him the keys to the store and told him that he was employed at the store and was removing the equipment at the request of the owner; Ortez admitted, however, that at some point during the evening's activities, he realized that they were actually stealing the equipment. Ortez stated that the first time he and defendant drove to the store, defendant simply opened the front door with the store keys, to show

---

[2] We refer to Ortez Winfrey by his first name to avoid confusion with his brother, Orthy Winfrey, who is referred to later in the opinion. (See fn. 10, *post*.)

him that the keys really were to the store; he then relocked the door and they went out to eat, planning to return later. Ortez stated that they later picked up William Grant, a mutual acquaintance. The three returned to the store and removed numerous boxes of stereo equipment. In response to the officers' questions, Ortez indicated that he had previously seen defendant with a black briefcase and with a handgun resembling a .45 automatic.

After learning of defendant's identity from Ortez, the detectives checked defendant's fingerprints—which were apparently available from existing criminal records—against the fingerprints that had been found at the murder scene. The tests indicated that defendant's prints matched prints found in several locations in the Margulies' home. On the strength of this match, Ortez' statement, the stereo equipment found in Ortez's possession, and the facts supporting the initial search warrant for Ortez's home, the detectives obtained warrants to search defendant's and William Grant's residences. The searches were conducted that same day, August 16, and stereo components that had been taken from Beverly Stereo were found in both homes. In addition, the keys that had been taken from the Margulies' house were found in defendant's residence. Grant and defendant were arrested.

After being advised of his *Miranda* rights, defendant initially agreed to talk to the police. He denied that he had committed burglary or murder, claimed that he had bought the stereo equipment several months earlier from a stranger on the street, disclaimed any knowledge of the Margulies' keys, and stated emphatically that he had never been in any house in the area of the city in which the Margulies' home was located. When the interrogating officers indicated that they did not believe him, he asked to see a lawyer and the interrogation ended.

On the basis of the foregoing matters, defendant was charged with two counts of murder (§ 187), two counts of burglary (§ 459), two counts of robbery (§ 211), and one count of rape (§ 261, subds. (2), (3)); use of a firearm (§§ 12022.5, 1203.06, subd. (a)(1)(i)) and great bodily injury (§ 1203.09) allegations were also alleged. With respect to the murder of Harry Margulies, three special circumstances were alleged: (1) robbery felony murder (former § 190.2, subd. (c)(3)(i)), (2) burglary felony murder (*id.,* subd. (c)(3)(v), and (3) multiple murder (*id.,* subd. (c)(5)). With respect to the murder of Avone Margulies, four special circumstances were alleged: the same three as alleged with respect to Harry's murder, and rape felony murder (*id.,* subd. (c)(3)(iii)).

At the guilt/special circumstance phase, the prosecution's evidence revealed the facts set forth above.[3] At the conclusion of the prosecution's case, the trial court granted defendant's motion for acquittal on the charge of robbery of Avone Margulies and denied defendant's motions with respect to the remaining charges.

The defense then proceeded with its case. The defense attempted to discredit various aspects of the prosecution's evidence; several witnesses stated that defendant did not have a black briefcase and a few testified that they had seen Ortez with such a briefcase. Evidence was also presented indicating that, while in high school, Ortez had stolen a key from a teacher's key ring and had used the key to open a cabinet from which three tape recorders were taken. In addition, defendant's sister testified that defendant had been at his own home between 3 and 5 p.m. on the day of the murders.

At the request of the prosecution, the trial court struck the burglary felony-murder special-circumstance allegations that had been charged with respect to each of the murders. It submitted the five remaining special-circumstance allegations—two robbery felony-murder allegations, one rape felony-murder allegation, and two multiple murder allegations—to the jury, along with the underlying murder, burglary, robbery and rape charges. After three days of deliberation, the jury found defendant guilty of all charges, and found true all five of the special circumstances.

At the penalty phase, the prosecution presented no additional evidence and the defense presented some evidence in mitigation. During the course of its deliberations, the jury occasionally asked for additional guidance. The jury eventually returned a verdict imposing the death sentence.

Thereafter, the trial court denied defendant's motions for new trial and for modification of the verdict. As noted, this appeal is automatic.

## II. Guilt Issues

### A. Validity of "Nighttime" Search

■ Defendant initially contends that the trial court erred in denying his pretrial motion to suppress all of the evidence obtained as a result of the search of his home and of Ortez's and Grant's homes. Although all three searches were conducted pursuant to warrants, defendant contends that the

---

[3] Ortez testified for the prosecution under an arrangement in which the burglary charges against him were to be dismissed in consideration for his truthful testimony. He told substantially the same story on the witness stand as he had to the police.

initial search of Ortez's home was an invalid "nighttime" search, and that all the evidence obtained thereafter was tainted "fruit" of that initial search. Defendant acknowledges that the magistrate who issued the search warrant for Ortez's home (hereafter the Ortez warrant) specifically authorized the execution of the warrant at any time of day or night, but he contends that the affidavit in support of that warrant did not contain sufficient facts to justify the magistrate's authorization of nighttime service, and thus he reasons that the search was nonetheless invalid. We conclude that defendant's contention is unfounded.

At the pretrial hearing on the motion to suppress, the prosecution presented a two-pronged response to defendant's claim, maintaining, first, that the Ortez warrant had been properly endorsed for nighttime service, and, second, that, in any event, the search warrant had actually been executed during the daytime. In support of the latter claim, the investigating police officer testified that he had executed the Ortez warrant at 7:05 a.m. on August 16, five minutes after the beginning of "daytime" as defined by statute. (See § 1533.) The defense vigorously challenged the officer's testimony in this regard, pointing out that in at least three investigative reports written shortly after the search, the police officers had noted the time of the execution of the warrant as 6:30 a.m.[4] The trial court's comments in denying defendant's motion are somewhat ambiguous, but it appears that the court concluded that it did not need to resolve the conflict over the time at which the warrant was actually executed, because it found as a threshold matter that defendant had failed to demonstrate that the magistrate had abused his discretion in authorizing nighttime service of the warrant.[5] We agree with the trial court's ruling.

Under the governing California statutes, although search warrants, as a general rule, are to be executed in the daytime, a magistrate may authorize nighttime service of a warrant in a particular case for "good cause." (§§

[4] Although the investigating officer had attempted to explain that the 6:30 a.m. notation on the police reports was only an approximate figure and simply referred to the time when the officers had arrived in front of Ortez's house but not to the time when the warrant was actually executed, defense counsel argued that this explanation of the reports was implausible if— as the investigating officer additionally testified—the officer had in fact consciously waited until after 7 a.m. to begin the search in order to avoid any possible legal challenge relating to nighttime service.

[5] In denying the motion to suppress, the trial court stated: "The Court has read the search warrant . . . and the points and authorities pointed out by counsel, and has listened to counsel for the People and for the defendant. [¶] The officer did testify that it was 7:03, and everything [defense counsel] states is true, that it was 6:30, as set forth by the officers. [¶] The officer attempted to explain, perhaps he didn't explain it very well, but perhaps, like Lewis Carroll 'it's not what I say, it's what I mean by what I say.' [¶] I don't find the time differential as set forth is fatal. *I feel they had sufficient facts from which to secure the warrants for all three of the premises.* [¶] Your motion, therefore, is denied." (Italics added.)

1529, 1533; *Solis* v. *Superior Court* (1966) 63 Cal.2d 774, 776-777 [48 Cal.Rptr. 169, 408 P.2d 945].)[6] ■ In recent years, a number of Court of Appeal opinions have offered different verbal formulations in an attempt to clarify the "good cause" standard in this context.[7] It is difficult, however, to anticipate all of the numerous factors that may justify the authorization of a nighttime search[8] and we think that the Sixth Circuit—in interpreting the comparable federal rule on nighttime searches[9]—adopted the proper perspective in suggesting that "[t]he Rule requires only *some factual basis for a prudent conclusion that the greater intrusiveness of a nighttime search is justified by the exigencies of the situation.* The procedural requirements of the Rule ensure that the fact that nighttime search is contemplated by the police is brought to the attention of a magistrate and that he or she consciously decide[s] whether such a particularly abrasive intrusion is called for in a given situation." (*United States* v. *Searp* (6th Cir. 1978) 586 F.2d 1117, 1121, 58 A.L.R.Fed. 743, italics added.)

■ In the present case, we cannot say that the magistrate erred in concluding that the "exigencies of the situation"—as revealed by the facts set forth in the affidavit in support of the search warrant (see, e.g., *People* v. *Mardian* (1975) 47 Cal.App.3d 16, 35 [121 Cal.Rptr. 269])—justified the execution of the warrant either in the daytime or at night. The investigating officers completed the drafting of the affidavit in support of the warrant at approximately 6 p.m. on August 15, and reached the magistrate at his home at 7 p.m. The affidavit disclosed numerous facts from which the magistrate could reasonably conclude that the burglary at Beverly Stereo and the

---

[6] Section 1529, in setting forth the general form of search warrants, indicates that the warrant should state that the executing official is directed to conduct the authorized search "in the daytime (or at any time of the day or night, as the case may be, according to Section 1533) . . . ." Section 1533, in turn, provides: "Upon a showing of good cause, the magistrate may, in his discretion, insert a direction in a search warrant that it may be served at any time of the day or night. In the absence of such a direction, the warrant shall be served only between the hours of 7 o'clock a.m. and 10 o'clock p.m."

[7] Compare *People* v. *Watson* (1977) 75 Cal.App.3d 592, 597-598 [142 Cal.Rptr. 245] and *Tuttle* v. *Superior Court* (1981) 120 Cal.App.3d 320, 327-330 [174 Cal.Rptr. 576] with *People* v. *McCarter* (1981) 117 Cal.App.3d 894, 906-907 [173 Cal.Rptr. 188] and *People* v. *Cletcher* (1982) 132 Cal.App.3d 878, 882-883 [183 Cal.Rptr. 480].

[8] The Model Code of Pre-Arraignment Procedure adopted by the American Law Institute would permit a magistrate to authorize nighttime execution of a search warrant "[u]pon a finding . . . of reasonable cause to believe that the place to be searched is difficult of speedy access, or that the objects to be seized are in danger of imminent removal, or that the warrant can only be safely or successfully executed at nighttime, *or under circumstances the occurrence of which is difficult to predict with accuracy.* . . ." (Italics added.) (Model Code of Pre-Arraignment Proc., § SS 220.2(3).)

[9] Rule 41(c)(1) of the Federal Rules of Criminal Procedure provides in relevant part that "[t]he [search] warrant shall be served in the daytime, unless the issuing authority, by appropriate provision in the warrant, and *for reasonable cause shown,* authorizes its execution at times other than daytime." (Italics added.) Rule 41(h) defines "daytime," as used in the rule, "to mean the hours from 6:00 a.m. to 10:00 p.m. according to local time."

double homicide at the Margulies' residence were closely related and that evidence of both the burglary and the homicides might be found at Ortez's home.[10] Because the evidence consisted, in part, of recently stolen stereo equipment, the magistrate could reasonably infer that the persons who had stolen the property would attempt to dispose of it as quickly as possible, and this would be particularly true if—as it appeared—the offenders recognized that the equipment could connect them not only with a burglary but with two murders as well. Finally, in view of the nature of the homicides that were under investigation, the magistrate could reasonably conclude that there was an exceptionally compelling interest in permitting the police to expedite their investigation, in order to apprehend a dangerous killer or killers who remained at large. Under these circumstances, we find no basis for faulting the magistrate's decision to permit the execution of the warrant either in the daytime or at night, particularly in light of the established principle that—in close cases—"[t]he reasonableness of an asserted justification . . . is 'largely determined by the preference to be accorded to warrants.'" (*United States* v. *Gibbons* (10th Cir. 1979) 607 F.2d 1320, 1327.)

The fact that the officers did not serve the warrant until early the next morning in no way undermines the magistrate's implicit determination that the exigencies of the situation justified nighttime service. The officers testified that after obtaining the warrant it took several hours to assemble a group of officers and to plan the method of execution so as to minimize the potential danger to the officers and to others. Because the search warrant for Ortez's residence properly authorized the execution of the warrant at night as well as during the day, the trial court did not err in denying defendant's motion to suppress.

### B. *Admission of Defendant's Statement to Police*

Defendant next contends the trial court erred in admitting, over his objection, a tape recording of the statement he made to the police shortly after his arrest. As noted, when confronted with the burglary and murder charges, defendant told the officers he had obtained the stereo equipment several months earlier and that he had never been in any house in the neighborhood where the victims resided. At the time defendant's statement was offered in evidence, however, the prosecution had already introduced evidence that, if credited, indicated the equipment had been taken from

---

[10] The affidavit indicated that at the time the investigating officers sought the Ortez warrant, they believed that Ortez and his brother Orthy—who matched the description given by the Margulies' neighbor of the person he had seen hiding in the bushes outside the residence—were involved in both the stereo store burglary and the murders.

Beverly Stereo on the night of the burglary and that defendant's fingerprints had been found in several locations in the victims' home.

■ Defendant apparently recognizes that, as a general rule, false statements made by a defendant at the time of arrest are admissible—not for the truth of the statements—but to show consciousness of guilt. As Witkin explains: "False statements deliberately made by defendants to arresting officers concerning matters within [defendants'] own knowledge, and relating to the issue of guilt or innocence, 'cogently evidence consciousness of guilt and suggest that there is no honest explanation for incriminating circumstances.'" (Witkin, Cal. Evidence (2d ed. 1966) § 512, at p. 482, and cases cited.)[11] Defendant contends, however, that this general rule is limited to prior statements of the defendant whose "falsity" is demonstrated by the fact that they are contrary to the defendant's own trial testimony. ■ Because defendant did not testify at trial, he maintains that his prior statement should have been excluded. ■ Although defendant's contention does find support in a number of recent Court of Appeal decisions,[12] as we shall explain these decisions are inconsistent with a long line of contrary authority both in California and in other jurisdictions and rest on flawed reasoning. ■ Accordingly, we conclude defendant's prior statement was properly admitted.

■ We begin with the established California precedent. In *People* v. *Cole* (1903) 141 Cal. 88 [74 P. 547], the defendant, a shipping clerk and salesman employed by a furniture store, was accused of improperly selling some of the store's carpets and keeping the proceeds of the sale. When charged with the crime, he denied delivering the carpets in question to anyone, and denied even knowing the person who had purchased the goods. The court admitted evidence of these statements at trial, and on appeal defendant asserted the statements should have been excluded. The *Cole* court rejected the claim, explaining: "This denial of defendant we think was competent and proper evidence to go to the jury for what it was worth. *If the jury believed* that defendant delivered the property, *disclosed by the testimony of some three witnesses,* then the fact that defendant denied the delivery was a circumstance tending to show that the delivery was not made innocently in his capacity as a salesman, but with intent to steal the property. If he had delivered the property innocently, the most natural thing for

_____

[11] Of course, if the prior statement is of such a nature that, even if false, it would not reasonably demonstrate defendant's consciousness of guilt, the statement would not be admissible on this ground. (See *People* v. *Albertson* (1944) 23 Cal.2d 550, 581-582 [145 P.2d 7] (Traynor, J., conc.).) The statement at issue here is clearly not of that nature.

[12] See *People* v. *Morgan* (1978) 87 Cal.App.3d 59, 68-69 [150 Cal.Rptr. 712]; *People* v. *Thomas* (1979) 96 Cal.App.3d 507, 510-511 [158 Cal.Rptr. 120]; *People* v. *La Salle* (1980) 103 Cal.App.3d 139, 152 [162 Cal.Rptr. 816]; *People* v. *Pic'l* (1981) 114 Cal.App.3d 824, 864-866 [171 Cal.Rptr. 106].

him to have done was to tell the truth about it. If he intended to steal it, the most natural thing for him to do when questioned about it was to lie concerning it. Deception, falsehood, and fabrications as to the facts of the case are treated as tending to show consciousness of guilt, and are admissible on the same theory as flight and concealment of the person when charged with crime." (*Id.*, at pp. 89-90, italics added.) Thus, even though the falsity of the defendant's prior statement was not proved by its inconsistency with the defendant's subsequent testimony but by the testimony of other witnesses, the statement was found admissible.

*People* v. *Amaya* (1941) 44 Cal.App.2d 656, 659 [112 P.2d 942], is to the same effect. In *Amaya,* the defendant objected to introduction of a statement he had made to the police in which he claimed that on a specific occasion in the past he had found the man, whom he was accused of killing, in bed with his wife. In dismissing the objection, the *Amaya* court stated: "In an attempt to prove the falsity of such statement *the People produced two witnesses, . . . a stepson . . . and . . . a stepdaughter [of defendant] who testified that on the occasion mentioned when [defendant] came home neither [the] deceased nor any other man was in bed with their mother.* Such testimony was properly received in evidence, it being the established law of this state that evidence may be introduced to show that a defendant has made false statements for the purpose of misleading or warding off suspicion and that such false statements, though not conclusive of guilt, may strengthen inferences of guilt arising from other facts. [Citation.]" (44 Cal.App.2d at p. 659, italics added.) Other cases similarly demonstrate that the general rule as to the admissibility of false statements or explanations given by a defendant with respect to the charged offense is not subject to the limitation which defendant proposes. (See, e.g., *People* v. *Osslo* (1958) 50 Cal.2d 75, 93 [323 P.2d 397]; *People* v. *Showers* (1968) 68 Cal.2d 639, 643 [68 Cal.Rptr. 459, 440 P.2d 939]; *People* v. *Peete* (1921) 54 Cal.App. 333, 352-353 [202 P. 51].) Authority from other jurisdictions also refutes defendant's position. (See generally 2 Wigmore on Evidence (Chadbourn ed. 1979) § 278, p. 133 et seq. and cases cited.)

The series of recent Court of Appeal decisions on which defendant relies—all of which emanate from *People* v. *Morgan, supra,* 87 Cal.App.3d 59, 67-69—overlooked the foregoing authority. Instead, apparently treating the question as one of first impression, the *Morgan* court reasoned that unless the falsity of the defendant's prior statement were established by his own testimony, it would be "speculation of the rankest sort" to infer that the

prior statement demonstrates a consciousness of guilt on the part of the defendant.[13]

The logic of this reasoning escapes us. First, because the defendant's prior statement is not being introduced to prove the truth of the statement but simply to prove that the defendant made it, the jury can properly evaluate the evidence to determine if the prior statement was made, whether or not the defendant takes the stand. Second, although the fact that a defendant has—on the witness stand—contradicted a prior statement that he made relating to the crime provides *one* basis for the jury to determine that the earlier statement was false, it simply does not follow that the jury would necessarily be engaging in "rank speculation" if it relied on other evidence to determine that the prior statement was false. In many cases, such other evidence—which may consist of physical evidence like fingerprints, or the testimony of trustworthy witnesses—will be equally, if not more, reliable than defendant's own in-court testimony. Of course, the jury need not believe the prosecution's evidence suggesting that the statement was false, and even if it finds that the statement was false, it need not conclude that defendant deliberately lied to hide his complicity in the crime. In brief, the question is one of weight, not admissibility. To the extent they are inconsistent with this conclusion, the decisions in *Morgan, Thomas, La Salle* and *Pic'l* (see fn. 12, *ante*) are disapproved.

■■ ■■■ ■ Accordingly, we conclude the court did not err in admitting defendant's statement to the police.[14]

---

[13] The *Morgan* court explained its conclusion as follows: "[When] an exculpatory statement of defendant [is] shown to be false by *defendant's own testimony* . . . it is logical to conclude that the falsity of the defendant's extrajudicial statement, established by defendant's own testimony, leads to a reasonable inference of defendant's state of mind—a consciousness of guilt—and thence to a second inference—that defendant had acted in conformity with his state of mind and committed the offense charged. But here, the fact that defendant's exculpatory statement conflicts with testimony from a *prosecution* witness, cannot be said to lead reasonably to an inference that it shows defendant's state of mind of a consciousness of guilt. Any such inference would amount to speculation of the rankest sort. *Nonreasonable* inferences sought to be drawn from evidence makes such evidence inadmissible as being *irrelevant,* since evidence, to be relevant, is limited to evidence 'having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action.' [Citation.]" (87 Cal.App.3d at p. 69, original italics.)

[14] Because we conclude that the statement was properly admitted to prove consciousness of guilt, defendant's related objection to the giving of a consciousness of guilt instruction (CALJIC No. 2.15) is clearly without merit.

Defendant raises a subsidiary claim with respect to the admission of his statement to the police. He contends that even if the statement, as a whole, was properly admitted, the court erred in refusing to exclude some portions which defendant contends were unduly prejudicial. (See Evid. Code, § 352.) Defendant suggests (1) that the jury may have inferred from some of the interrogating officers' questions that they had additional evidence against defendant that was not introduced at trial and (2) that one passage of the interrogation—in which defendant stated that he would "bet [his] life" that the police had not found his fingerprints

## C. *Admission of Photo of Victims While Alive*

■ Defendant contends the court erred in admitting a photograph of the victims that was taken when they were alive. At trial, defendant offered to stipulate (1) that the bodies found at the scene of the killings were the Margulies and (2) that they had been alive prior to the incident. He objected to the admission of the photo as irrelevant and unduly prejudicial.

As defendant asserts, *People* v. *Ramos* (1982) 30 Cal.3d 553, 577-578 [180 Cal.Rptr. 266, 639 P.2d 908], indicates that such photographs probably should be excluded. Nonetheless, as in *Ramos,* we find the error was not prejudicial. The case against defendant was quite strong: he was identified as the person hiding in the bushes at the victims' house on the day of the murders, his fingerprints were found at the scene of the crime, he participated in a burglary of the victims' store just a few hours after the murder occurred, and the keys to the store that had been taken from the victims' house at the time of the murders were found in his home. The introduction of the photograph of the victims could not have affected the verdict. (*People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].)

## III. SPECIAL CIRCUMSTANCES ISSUES

### A. *Validity of Rape and Robbery Felony-murder Special-Circumstance Findings*

■ Defendant initially contends the three felony-murder special-circumstance findings—two robberies and one rape—must be reversed for instructional error. In instructing on all of the felony-murder special-circumstance allegations, the trial court informed the jury, in the language of the 1977 statute, that a special circumstance would be established if, inter alia, the jury found the murder was committed "during the commission" of the separate felony, i.e., the robbery or the rape.[15] Defendant maintains the

---

at the murder scene—may have unfairly prejudiced defendant at the penalty phase. With respect to the first claim, we believe that the trial court could properly conclude that the jury would not infer from the officers' questioning tactics that evidence which the prosecution had not introduced at trial in fact existed. Indeed, the jury was instructed that "[a] question is not evidence" and that it must not "assume to be true any insinuation suggested by a question asked a witness" and defendant could have requested a more specific instruction if he felt the jury might not apply this instruction to the police officers' interrogation questions. With respect to the latter point, we think that while the "bet my life" comment was somewhat dramatic in light of the capital setting, the court could properly have determined that the passage was an important part of the entire statement and that it demonstrated that defendant was aware of the seriousness of the situation when he gave the false explanation to the police.

[15] The instructions provided in relevant part: "To find that the special circumstances, referred to in the instructions as murder in commission of a robbery, is true, each of the following facts must be proved: [¶] 1. That the murder was willful, deliberate and premeditated,

court erred in failing to give, sua sponte, an additional instruction to explain the clarifying interpretation of the felony-murder special-circumstance provisions embodied in *People* v. *Green* (1980) 27 Cal.3d 1, 59-62 [164 Cal.Rptr. 1, 609 P.2d 468] and *People* v. *Thompson* (1980) 27 Cal.3d 303, 321-325 [165 Cal.Rptr. 289, 611 P.2d 883]. We find defendant's argument unpersuasive.

In *Green,* one of the first cases to consider the meaning of the felony-murder special-circumstance provisions of the 1977 death penalty law, the defendant—before intentionally killing his wife—had taken all of her clothing at gun point in order to attempt to conceal the crime. As we later explained in *People* v. *Robertson* (1982) 33 Cal.3d 21 [188 Cal.Rptr. 77, 655 P.2d 279]: "Although the taking of his wife's clothing by force constituted a technical robbery, we concluded [in *Green*] that the circumstances of that case did not constitute 'a murder in the commission of a robbery but the exact opposite, a robbery in the commission of a murder.' [Citation.] Recognizing that '[a]t the very least . . . the Legislature must have intended that each special circumstance provide a rational basis for distinguishing between those murderers who deserve to be considered for the death penalty and those who do not,' we concluded that such a goal 'is not achieved . . . when the defendant's intent is not to steal but to kill and the *robbery is merely incidental to the murder . . . because its sole object is to facilitate or conceal the primary crime.*' [Citation.] In holding such an 'incidental' robbery would not provide a proper basis for a special-circumstance finding, we specifically contrasted that case with one in which a defendant 'kill[s] in cold blood in order to advance an independent felonious purpose, e.g., . . . carrie[s] out an execution-style slaying of the victim of or witness to a holdup, kidnaping, or a rape.' [Citation.])" (*Id.,* at p. 52, italics added.)

In *Thompson,* we applied the principle of *Green* in a different factual setting. There the evidence revealed quite clearly that the defendant had come to the victims' house, at the behest of another, in order to kill the victims; during his confrontation with the victims he refused their offers of

---

and [¶] 2. That defendant was personally present during the commission of the act or acts causing death, and [¶] 3. That defendant, with intent to cause death, physically aided or committed the act or acts causing death, and [¶] 4. *That the murder was committed during the commission of a robbery.*" (Italics added.)

"To find that the special circumstance, referred to in these instructions as murder in commission of a rape, is true, each of the following facts must be proved: [¶] 1. That the murder was willful, deliberate and premeditated, and [¶] 2. That defendant was personally present during the commission of the act or acts causing death, and [¶] 3. That defendant, with the intent to cause death, physically aided or committed the act or acts causing death, and [¶] 4. *That the murder was committed during the commission.*" (Italics added.)

In giving the latter instruction, the trial court apparently omitted the phrase "of a rape" at the end of the last quoted sentence, but in context it is clear that the instruction refers to "during the commission of a rape." Defendant does not contend otherwise.

jewelry and money and asked for and took only their car keys. In concluding that the evidence presented at trial was not sufficient to sustain a robbery felony-murder special-circumstance finding under *Green,* we explained: "[T]he determination as to whether or not a murder was committed *during* the commission of robbery or other specified felony is not 'a matter of semantics or simple chronology' . . . [but] [r]ather . . . involves proof of the intent of the accused. A murder is not committed *during* a robbery within the meaning of the statute unless the accused has 'killed in cold blood *in order to advance an independent felonious purpose,* e.g., [has] carried out an execution-style slaying of the victim or witness to a holdup, a kidnaping, or a rape.' " *(Thompson, supra,* 27 Cal.3d at p. 322 [quoting *Green, supra,* 27 Cal.3d at pp. 60, 61; italics added in *Thompson*].) Noting the evidence in *Thompson* suggested the defendant may have taken the car keys "simply to effect his getaway from the shootings," we found that "[w]hen the whole record is viewed in a light most favorable to the verdict, it establishes at most a suspicion that [defendant] had an intent to steal independent of his intent to kill." (27 Cal.3d at p. 324.) Under such circumstances, we concluded the special-circumstance finding could not be upheld. (*Id.,* at pp. 324-325.)

⬛⬛ Preliminarily, we reject the dissent's novel suggestion that *Green's* clarification of the scope of felony-murder special circumstances has somehow become an "element" of such special circumstances, on which the jury must be instructed in all cases regardless of whether the *evidence* supports such an instruction. Our cases have never treated *Green* in this fashion. (See *Green, supra,* 27 Cal.3d at p. 62; *Thompson, supra,* 27 Cal.3d at pp. 332-325; *Robertson, supra,* 33 Cal.3d at p. 52.) Nor have we so treated other "clarifying" holdings in analogous settings. (See, e.g., *People v. Daniels* (1969) 71 Cal.2d 1119, 1139-1140 [80 Cal.Rptr. 897, 459 P.2d 225, 43 A.L.R.3d 677] [clarifying the "asportation" element of section 209, kidnapping]; *People v. Thomas* (1970) 3 Cal.App.3d 859, 866 [83 Cal.Rptr. 879] [affirming pursuant to *Daniels* although no "clarifying" instruction was given]; *People v. Thornton* (1974) 11 Cal.3d 738, 768 & fn. 20 [114 Cal.Rptr. 467, 523 P.2d 267] [same].) These cases disclose that the mere act of "clarifying" the scope of an element of a crime or a special circumstance does not create a new and separate element of that crime or special circumstance. ⬛⬛⬛ We therefore proceed to determine whether, on this record, the court's instructions adequately explained the general principle of law requiring a jury determination of whether the murder was committed "during the commission" of a felony.[16]

---

[16] As the dissent notes, CALJIC No. 8.81.17, paragraph 3, incorporates the *Green* holding. Presumably trial courts have given this instruction as a matter of course in post-*Green* trials. Nothing in our opinion today is intended to discourage such a practice.

As defendant apparently concedes, there was substantial evidence from which the jury could have found the rape and robberies were not "incidental" to the murders within the meaning of *Green* or *Thompson*. Because the burglary of the stereo store followed so closely after the theft of the store keys from the Margulies' home, the jury could reasonably have found that the crimes at the house were planned to obtain those keys. The jury could also have found that in order to carry out his planned theft of the keys—and perhaps other items[17]—defendant had brought the handcuffs, bicycle lock and cable, and adhesive tape in the briefcase to inmobilize the victims and to minimize their ability to identify him as he committed the crimes. Finally, the jury could have found that after defendant handcuffed and tied up the victims, applied the adhesive tape and raped Avone, one of the victims managed to set off the alarm system, and that thereafter defendant shot the two victims quickly, either out of panic or as a result of a conscious decision to attempt to eliminate the potential witnesses to his crimes. If the jury found that the crimes occurred in this fashion, *Green* and *Thompson* would clearly pose no obstacle to finding that the murders were committed "to advance an independent felonious purpose" and thus that the felony-murder special circumstances had been adequately established.

It is true that the prosecutor relied on a theory that the murders were committed for revenge,[18] but this does not alter the fact that *the evidence*

[17] The police found a small pile of items—a clock, a locket and some stereo albums—near the front door of the house after the crimes. Defense counsel suggested in closing argument that the perpetrator had planned to steal those items but left without them after the burglar alarm sounded.

[18] The following excerpts disclose the gist of the prosecutor's argument: "[R]ight at the outset I think it must be plain to you that Mr. Kimble in his activities of that afternoon and evening was interested in something more than just obtaining some stereo equipment. [¶] How do we know that? [¶] Well, first of all it's obvious that he had some knowledge of the Margulies family, their business, their home, and their operation. How else would he just about an hour after killing two people, taking the keys, show up at the Winfrey home and ask for support in the burglarizing? He had to know the connection between the Margulies family and the stereo store. I don't think you can conceive any other situation. This would strongly suggest that, by golly, he had some reason to gravely dislike the Margulies people, whatever it may be. Remember, that he went into the home, went to all this trouble to carry the equipment in a briefcase, carry the handcuffs, disable these people, blindfold them, gag them. If he was interested in getting some stereo equipment, he surely could have done it a lot easier, a lot faster, than committing the most aggravated crime that he did in the Margulies home. [¶] . . . I think that we have to say for whatever reason he had it in for Mr. and Mrs. Margulies, and how could he get more complete, more sadistic revenge upon anyone than by what he did?

". . . . . . . . . . . . . . . . . .

". . . [I]f Mr. Kimble had only the intent to steal, only the intent to burglarize the home, . . . . once the neighbor had seen him, . . . after thus being identified virtually on the property of the planned victim, surely a burglar with no motive greater than just to obtain some equipment would have backed off, found another house. [¶] No way is he going to come back to that same place to kill people. Uh-uh. [¶] The only reason he came back that day is because

clearly showed a concurrent intent to rape Avone and steal the stereo store keys. Further, as defense counsel suggested in his closing argument, there was no direct *evidence* presented at trial to support the prosecutor's "revenge-killing" theory. No one testified that there had been any previous contact between defendant and any members of the Margulies family, nor was there any direct evidence that defendant had any reason for hating them or seeking vengeance against them.

In light of all this, defendant asserts the court was under a sua sponte duty to give clarifying instructions. We disagree. ▮▮▮ Sua sponte instructions are required only " ' "on the general principles of law relevant to the issues *raised by the evidence.* [Citations.] The general principles of law governing the case are those principles closely and openly connected with the *facts* before the court, and which are necessary for the jury's understanding of the case." [Citation.]' " (*People* v. *Wickersham* (1982) 32 Cal.3d 307, 323 [185 Cal.Rptr. 436, 650 P.2d 311] italics added.) ▮▮▮ In the present case, there was little more than speculation to support the prosecutor's proposed scenario. On the other hand, as explained above, there was abundant evidence that the rape and robberies were not "incidental" to the murders. *(Ante,* p. 502.) In the absence of *evidentiary* support for the People's speculative theory, and in view of the actual evidence in the case, the court was under no sua sponte obligation to instruct concerning that theory or its limitations.

In sum, we conclude the court's instructions correctly and adequately explained the general principle of law requiring a determination whether the murder was committed "during the commission" of a felony. ▮▮▮ Because the evidence, as opposed to mere speculation, raised no issue with respect to the application of the special circumstance law, and because the trial court correctly instructed the jury regarding that law, it was defendant's obligation to request any clarifying or amplifying instruction on that subject. (*People* v. *Anderson* (1966) 64 Cal.2d 633, 639 [51 Cal.Rptr. 238, 414 P.2d 366].)

---

inside him he had a burning hatred of the Margulies family and probably their stereo store, to run the risk of going back to the same place and doing what you know he did.

". . . . . . . . . . . . .

". . . I think when you take all of it together, all of the circumstances that we have in fact proven, consider all of the evidence before you, that you will find from that evidence that there is really no doubt of any kind but that the defendant personally killed Harry and Avone Margulies, that he robbed them of the stereo keys, that he raped Avone Margulies, that he entered that home with the full intent to do these crimes. [¶] He didn't go in there just intending to steal, just intending to rape, he went there, I submit to you, ready to murder."

### B. *Multiple-murder Special-circumstance Findings*

██ ██ Defendant contends the prosecution erred in charging two separate multiple murder special circumstances on the basis of the two homicides. He is correct; as we recently held in *People* v. *Allen* (1986) 42 Cal.3d 1222 [232 Cal.Rptr. 849, 729 P.2d 115], appropriate charging papers should allege one multiple-murder special circumstance relating to all individual murder counts. (*Id.,* at p. 1273.)

## IV. PENALTY ISSUES

### A. *Excessive Multiple-murder Special Circumstances*

As noted above, it was improper for the jury to be permitted to find two multiple-murder special circumstances instead of one. It was also error for the jury to consider those findings as two aggravating factors at the penalty phase. The jury, however, was well aware that there were two murder victims, and on the facts of this case, we believe it very unlikely that the jury's deliberations were affected by the existence of two multiple-murder special circumstances rather than only one. (See *People* v. *Rodriguez* (1986) 42 Cal.3d 730, 787-788 [230 Cal.Rptr. 667, 726 P.2d 113]; *Allen, supra,* 42 Cal.3d at pp. 1281-1283.) Indeed, the prosecutor did not even mention the number of multiple-murder special circumstances in his penalty argument. Accordingly, we cannot conclude the error affected the penalty verdict.

### B. *Improper Interpretation of Former Section 190.3, Subdivision (b)*

██ The prosecution presented no evidence that defendant had engaged in any criminal activity involving force or violence other than the underlying crimes for which he had been convicted at the guilt/special-circumstance phase. During closing argument at the penalty phase, however, the prosecutor—in discussing factor (b) of the statutory list of aggravating and mitigating circumstances, i.e., "the presence or absence of criminal activity by the defendant which involved the use or attempted use of force or violence" (former § 190.3, 5th par., subd. (b))—urged the jury to find the presence of violent criminal activity within the meaning of this factor simply on the basis of the underlying offenses in this case. "The presence or absence of criminal activity by the defendant which involved the use or attempted use of force or violence. All that we have before you is the killing of Harry and Avone Margulies. What more violent use of force do you ever expect to see? That 45 minutes, ladies and gentlemen, is the true identity of Eric Kimble."

Shortly thereafter, defense counsel moved for a mistrial, arguing the prosecutor had misinterpreted this provision of the statute and that factor (b) was intended to apply only to criminal activity other than the underlying offense. The court denied the motion, indicating it did not find the prosecutor's argument improper. Defendant contends the court should have made it clear to the jury that "violent criminal activity" referred only to criminal activity other than the crimes of which defendant was convicted in the guilt phase. As we have recently held in *People* v. *Miranda* (1987) 44 Cal.3d 57, 105-106 [241 Cal.Rptr. 594, 744 P.2d 1127] (1978 death penalty law), it is improper for a prosecutor to argue that the jury should view the guilt phase crimes as aggravating evidence under subdivision (b).

A close reading of the former (1977) statute—the relevant language of which is identical to the present (1978) statute—discloses that the term "criminal activity" in subdivision (b) does not include the immediate circumstances for which the death penalty is being contemplated. The first paragraph of former section 190.3 states: "In the proceedings on the question of penalty, evidence may be presented by both the people and the defendant as to any matter relevant to aggravation, mitigation, and sentence, including, but not limited to, *the nature and circumstances of the present offense,* the presence or absence of *other criminal activity* by the defendant which involved the use or attempted use of force or violence or which involved the express or implied threat to use force or violence, and the defendant's character, background, history, mental condition and physical condition." (Italics added.) Subsequent paragraphs refer to *"other* criminal activity" or *"prior* criminal activity."

Viewing the statute as a whole, we must read former section 190.3 to mean that only evidence of criminal activity *other* than the capital offense is relevant to subdivision (b). (*Miranda, supra,* 44 Cal.3d at pp. 105-106.) Such a reading is consistent with the statute, which appears to distinguish between the "present offense" and "other criminal activity," and would avoid possible constitutional problems involving artificial inflation of aggravating circumstances.

We disagree, however, with defendant's suggestion that reading the instruction per se amounts to error. As we stated in *Miranda, supra,* 44 Cal.3d 57, we doubt a reasonable jury would "double count" under subdivisions (a) and (b), in the absence of misleading argument by the prosecutor inviting it to do so. On this record, however, it is apparent that the prosecutor's argument was improper.

Nevertheless, we conclude that any error was harmless. First, the comment was brief. Second, the comment expressly declared that only the

crimes for which defendant was being tried were before the jury for its consideration, and simply referred to the crimes for emphasis; the reference could not reasonably have skewed the sentencing determination by suggesting there was other criminal activity or by inviting double counting. Third, the evidence that the prosecutor asked the jury to consider in aggravation under subdivision (b) could properly have been considered under subdivision (a). In view of the properly admitted aggravating factors presented to the jury—specifically, the evidence under factor (a) (the circumstances of the present crime and any special circumstance found true)—we find it inconceivable that the jury would have reached a different verdict in the absence of the improper argument; accordingly, there was no prejudice. For the same reasons we also reject defendant's assertion that the prosecutor's comments constituted prejudicial misconduct.

## C. *Ambiguity Over the Scope of Jury's Sentencing Discretion*

■■■ After enumerating the 10 aggravating and mitigating factors listed in the 1977 death penalty statute, the court instructed the jury, pursuant to the terms of that law, that "[a]fter having considered all of the evidence of this case and having taken into account all of the applicable factors upon which you have been instructed you shall determine whether the penalty to be imposed on the defendant shall be death or confinement in the state prison for life without possibility of parole." (Former § 190.3, 6th par.) The jury retired for deliberations, and was given copies of all the court's instructions.

After a day of deliberations, the jury submitted a written question to the court, which read: "According to our printed instructions, special circumstances found to be true in Counts I and II of the information fix the penalty as either life imprisonment without the possibility of parole or death. [Are] there any further criteria that can be used to determine one penalty as opposed to the other *or is it simply the matter of our personal choice?*" (Italics added.)

On receiving the jury's question, the court informed both counsel that in its view "[i]t is not a matter of their personal choice, they are to follow the law, and I intend to so advise them and to reread the instructions." Defense counsel objected to the trial court's proposed response. He argued the note did not demonstrate that the jurors were confused about their responsibilities or about the guidelines set forth in former section 190.3 but "rather they manifest a complete understanding of them, and they are saying 'They aren't enough for us'. . . ."

The trial court rejected defense counsel's position and told the jury: "It is not a matter of your personal choice. At the time that you were sworn you

were sworn to follow the law as I read it to you. This takes it out of the province of its being your personal choice. [¶] You are to follow the law, regardless of what your personal choice may be. [¶] I again will emphasize there [are] no further criteria other than the instructions that have previously been given to you, and I will read the instructions again to you."

After rereading the instructions, the court concluded: "Ladies and gentlemen of the jury, I read the guidelines that are set forth by law. You are to use those guidelines and reach your decision. There [are] no further criteria that I can give you, and you are not to simply make it a matter of your personal choice. The choice must be according to the law that I have given to you. Regardless of what your personal choice in any given situation might be, that's not your duty. Your duty is not to follow your personal choice, but you are to follow what the law states that you must do, and that is what I have read to you in your instructions. Thank you. You may retire." After further deliberation, the jury returned a verdict of death.

We think the jury's question to the court was somewhat ambiguous. On the one hand, the question's use of the phrase "further criteria" for determining which penalty to impose suggests the jury had in mind the enumerated statutory factors and was inquiring whether there were additional criteria to which it could also resort. On the other hand, the question's use of the phrase "personal choice" suggests the jury was asking whether it could exercise unfettered and standardless discretion in choosing between the two penalties. In light of the ambiguity of the question it was entirely proper for the court to make it clear to the jury that it was required to consider and be guided by the enumerated factors, and that it could not simply disregard those factors in determining penalty.

Defendant argues the court's comments were likely to have misled the jury about the scope of its sentencing discretion. He maintains that although the court could properly inform the jury that its sentencing decision should be based on consideration of the statutory aggravating and mitigating factors, the comments went further and suggested that the sentencing decision was not a matter of the jury's own normative judgment as to the appropriateness of the alternative penalties, and that "the law" dictated that the sentencing decision be made on a basis other than the jury's "personal choice." The Attorney General, in response, asserts the court's comments properly precluded the jury from disregarding the statutory factors and deciding the question of penalty without considering the enumerated guidelines.

As the United States Supreme Court recently reiterated, "sentencers may not be given unbridled discretion in determining the fates of those

charged with capital offenses. The Constitution instead requires that death penalty statutes be structured so as to prevent the penalty from being administered in an arbitrary and unpredictable fashion." (*California* v. *Brown* (1987) 479 U.S. 538, 541 [93 L.Ed.2d 934, 939, 107 S.Ct. 837, 839] (plur. opn.) citing *Gregg* v. *Georgia* (1976) 428 U.S. 153 [49 L.Ed.2d 859, 96 S.Ct. 2909] and *Furman* v. *Georgia* (1972) 408 U.S. 238 [33 L.Ed.2d 346, 92 S.Ct. 2726].) ▆▆▆ The 1977 death penalty statute provided such guidance. Former section 190.3 instructed the jury that, "After having heard and received all of the evidence, the trier of fact shall consider, take into account and be guided by the aggravating and mitigating circumstances referred to in this section, and shall determine whether the penalty shall be death or life imprisonment without the possibility of parole."

In the present case, however, the jury asked the court whether the penalty decision was *"simply [a] matter of our personal choice?"* (Italics added.) ▆▆▆ Under the Constitution, the jury must "ignore emotional responses that are not rooted in the aggravating and mitigating evidence introduced during the penalty phase." (*California* v. *Brown, supra,* 479 U.S. at p. 542 [93 L.Ed.2d at p. 940, 107 S.Ct. at p. 840].) The jury may not act on whim or unbridled discretion. A penalty determination based on jury consideration of mere personal choice would inject into the proceedings the very arbitrariness and uncertainty forbidden by the Constitution. (*Furman, supra,* 408 U.S. 238.)

▆▆▆ Viewing the court's comments about "personal choice" in the context of the statutory instructions and counsel's argument thereon, we are confident that no error occurred. Nothing in the above-quoted statutory instructions delivered pursuant to the 1977 law suggests the jury may arrive at its sentencing decision without each juror making a personal decision about whether death is the appropriate penalty in a given case.

Moreover, our review of the prosecutor's arguments discloses he never suggested to the jury an improper understanding of its sentencing discretion. He correctly told the jury, "[y]ou're being asked in essence . . . in this phase of the case, to make a decision. You all agreed on voir dire . . . that you would consider both penalties after you heard all the evidence in this case . . . . [I]s this the type of murder that warrants the death penalty, or is it a lesser type of murder? Is there mitigation which would justify life imprisonment? [¶] That's your decision. It's an opinion. It's an opinion you have to reach . . . ." In closing, the prosecutor returned to this theme: "Now, I don't tell you one verdict or the other, but [the law] requires you, as you agreed, to fairly consider both verdicts, and determine if this is the kind of case for one or the other." In the same vein, defense counsel's

argument was calculated to impress on the jury the personal responsibility of each juror for his sentencing decision.

In this context, we believe the court's response to the "personal choice" question would not mislead a reasonable jury. We believe a reasonable juror would have understood he remained free to decide whether certain factors existed, to determine how the aggravating and mitigating factors should be weighed, and to determine what the sentence should be. We therefore conclude the jury was not misled about the scope of its sentencing discretion. (See *People* v. *Brown* (1985) 40 Cal.3d 512, 542 [230 Cal.Rptr. 834, 726 P.2d 516]; *People* v. *Allen, supra,* 42 Cal.3d 1222, 1276-1277.)

D. *Jury Consideration of Sympathy Evidence*

 In a related argument, defendant contends the jury was misled about whether it could consider sympathy evidence in determining penalty.

As noted, the prosecution presented no additional evidence at the penalty phase. The defense established that defendant was only 18 years old at the time of the incident, and presented a number of his relatives and friends who testified that he had not previously been in serious trouble with the law, that he was good natured, well-liked, helpful to his family, concerned with the welfare of the children in his neighborhood, and respectful and very kind to several elderly neighbors. The court instructed the jury, "In determining which penalty is to be imposed on the defendant, you shall consider all of the evidence which has been received during any part of the trial of this case." The court further instructed the jury that it may consider "any . . . circumstances which extenuate the gravity of the crime even though it is not a legal excuse for the crime." (Former § 190.3, subd. (j) (currently subd. (k).)

Defendant asserts the jury may have mistakenly believed it could not consider defendant's character and sympathy evidence. We have addressed essentially identical claims in a number of cases arising under the 1978 death penalty law, which contains in section 190.3, subdivision (k), the same language as appeared in the 1977 law's former section 190.3, subdivision (j). Our concern here, as in cases decided without the benefit of the "expanded factor (k)" instruction subsequently prescribed in *People* v. *Easley* (1983) 34 Cal.3d 858, 878 [196 Cal.Rptr. 309, 671 P.2d 813], footnote 10, is that the jury might have been left with the erroneous impression that defendant's character evidence which was unrelated to the "circumstances of the crime" was *irrelevant* to the jury's sentencing decision. After careful review of the whole record (*People* v. *Brown, supra,* 40 Cal.3d 512, 544, fn. 17), we are satisfied the jury was not so misled.

First, as previously discussed, the court did not err in instructing the jury to base its penalty determination on the evidence presented during trial rather than on factors unrelated to such evidence. We fail to see how this proper admonition worked to restrict the scope of mitigating character evidence the jury could consider in determining penalty.

Second, although it is possible that a reasonable jury might interpret the unadorned factor (j) instruction as unduly limiting its consideration of a defendant's mitigating evidence, we doubt this occurred here. As noted above, the jury was presented with mitigating character evidence, and it was instructed to consider "*all* of the evidence which has been received *during any part* of the trial of this case." (Italics added.) Most significantly, the prosecutor said nothing to suggest the jury should not consider such evidence. To the contrary, he indicated otherwise. First, he told the jury that defense counsel would ask that it show mercy. But, instead of stating it would be *improper* for the jury to show mercy, he argued the jury should "measure mercy by the mercy that . . . defendant himself exhibited and demonstrated." Later, in a similar vein, he told the jury he could not "understand you having any sympathy or empathy" for defendant. Likewise, he stated: "You heard all of the testimony, ladies and gentlemen. You will hear considerable more argument from both sides, but right now, as you look at it, isn't it a fair statement that as you consider aggravation and mitigation the stark thing before you is there is no mitigation?"

We believe the essence of the prosecutor's comments was identical to the argument made in *People* v. *Allen, supra,* 42 Cal.3d 1222. In *Allen,* the prosecutor argued that the defendant's sympathy evidence was " 'as good as nothing . . . . *If anything,* it's just the most pathetic, almost invisible mitigating evidence that you have ever seen.' " (42 Cal.3d at p. 1276, italics added.) We interpreted this statement to mean that although the prosecutor believed the evidence was without great value "it was quite proper for the jury to consider such evidence." (*Ibid.*)

At no time did the prosecutor urge the jury not to consider the sympathy evidence presented at the penalty phase. As in *Allen,* the prosecutor argued merely that the *weight* to which defendant's sympathy evidence was entitled was, in the prosecutor's opinion, minimal.[19] We therefore reject defendant's claim that the jury was misled into believing that it could not consider sympathy evidence in determining penalty.

[19] We note that defense counsel's argument further affirmed the jury's proper understanding of the scope of defendant's character evidence. Counsel explicitly argued the jury should consider that evidence, and asked, "[c]an you truly say in agreement with the [prosecutor] that that young man is without any redeeming human qualities? . . . [¶] I suggest that *the evidence* argues strongly to the contrary." (Italics added.)

E. *Response to a Jury Question Concerning its Inability to Reach a Unanimous Decision*

■ About the same time the jury submitted the "personal choice" question to the court, it submitted another question, asking, "[i]f the jury feels the possibility at this time that we will not be able to find a unanimous decision, what will then be the court's decision?" In response the court told the jury, "[t]hat is not your province." Defendant contends this response was inadequate and that the court should have told the jury—as was the situation under the 1977 death penalty law (former § 190.4, subd. (b))[20]— that if it were unable to reach a unanimous verdict defendant would be sentenced to life imprisonment without possibility of parole.

As defendant acknowledges, we held in an analogous context (involving guilt phase instructions) that a jury should not be instructed on the consequences of its failure to reach a unanimous verdict. In *People* v. *Dixon* (1979) 24 Cal.3d 43 [154 Cal.Rptr. 236, 592 P.2d 752], the defendant was tried for murder. During deliberations the jury asked the court whether, if it agreed the crime was murder but could not agree it was first degree, any verdict of second degree would have to be unanimous. The court answered yes, and the jury ultimately returned a first degree verdict. On appeal the defendant asserted that the court (i) misstated the law and (ii) should have told the jury that a failure to agree on a first degree verdict would automatically result in a second degree finding. We rejected the first contention, holding that in these circumstances a second degree verdict must be unanimous. In dismissing the second contention we observed, inter alia, that "it contemplates an instruction which would constitute an open invitation to a juror favoring the lesser degree to have his way by simply adhering to his opinion in spite of any arguments which might be raised by his fellow jurors against it." (*Id.*, at p. 53.)

Defendant urges we should resist extending our reasoning in *Dixon* to the present situation, and draws our attention to out-of-state authority to support this view. As we shall explain, however, most states hold, consistently with *Dixon,* that in the situation presented here, the trial court does not err by responding as it did.

In *State* v. *Williams* (La. 1980) 392 So.2d 619, the Louisiana Supreme Court held there was no error on facts essentially identical to ours. (*Id.*, at p. 625.) On rehearing, however, a plurality held that by failing to explain

---

[20] Section 190.4, subdivision (b), now provides that a new jury is to be impaneled to try the penalty issue if the original jury is unable to reach a unanimous verdict. If the second jury also fails to reach unanimity, the judge has discretion to impanel a third jury or to impose a life sentence without possibility of parole.

that a nonunanimous verdict would require the court to impose a life sentence, the trial court injected into the jury's sentencing determination a potential for arbitrariness and speculation, thereby resulting in a constitutionally unreliable penalty verdict:

"In the present case the jurors were not fully informed of the consequences of their votes and the penalties which could result in each eventuality. They were not told that, by their failure to decide unanimously, they would in fact decide that the court must impose a sentence of life imprisonment without benefit of probation, parole or suspension of sentence. Instead, the members of the sentencing body were left free to speculate as to what the outcome would be in the event there was not unanimity. Under these circumstances, individual jurors could rationally surmise that in the event of disagreement a new sentencing hearing, and perhaps a new trial, before another jury would be required. [¶] Such a false impression reasonably may have swayed a juror to join the majority, rather than hold to his honest convictions, in order to avoid forcing the parties, witnesses and court officials to undergo additional proceedings. Consequently, by allowing the jurors to remain ignorant of the true consequence of their failure to decide unanimously upon a recommendation, the trial court failed to suitably direct and limit the jury's discretion so as to minimize the risk of arbitrary and capricious action." (*Id.*, at pp. 634-635.)[21]

Defendant suggests that other states have followed *Williams* on this point, but we find the cases distinguishable.

In *State* v. *Ramseur* (1987) 106 N.J. 123 [524 A.2d 188, 277-286] the New Jersey Supreme Court cited *Williams* with apparent approval, but a close reading of the case discloses that the court's conclusion did not rest on *Williams's* premise that the jury had been misinformed in violation of the federal Constitution. (*Id.*, at pp. 282-284.) Instead, *Ramseur* turns on the court's determination, under state law, that repeated supplementary instructions on the importance of a unanimous verdict *coerced* the jury's verdict, amounting to an "*Allen*-type" (*Allen* v. *United States* (1896) 164 U.S. 492 [41 L.Ed. 528, 17 S.Ct. 154]) charge that required reversal and resentencing. (524 A.2d at pp. 280-283, 284-285.)

In *People* v. *Durre* (Colo. 1984) 690 P.2d 165, the Colorado Supreme Court reversed a penalty judgment because the jury's decision to sentence

---

[21] In a later case in which (i) the jury deliberated only about an hour before asking the court about the consequences of a nonunanimous verdict, and (ii) the defendant requested specific instructions pursuant to *Williams,* the Louisiana Supreme Court held the trial court committed reversible error by failing to give the requested instruction. (*State* v. *Loyd* (La. 1984) 459 So.2d 498, 502-503.)

the defendant to death was not unanimous. The jury in *Durre,* unlike in *Williams, Ramseur,* and the present case, did not express to the court any difficulty arriving at a verdict. Instead, the jury announced it had reached a verdict, and sent a note to the court along with its findings on mitigation and aggravation. The note explained that whereas the jury (i) unanimously found no mitigating circumstance sufficient to justify a sentence of life imprisonment rather than death, and (ii) unanimously found at least one aggravating factor, still five of the twelve jurors did not agree that death was warranted, and "ask[ed] for life imprisonment only." (*Id.,* at p. 170.) The trial court accepted this "verdict," and sentenced the defendant to death.

The state supreme court reversed, noting that a unanimous decision on the appropriateness of the death penalty was required under state law. (*Id.,* at pp. 171-173.) The court observed that the jury apparently did not understand that it was supposed to determine whether death is the appropriate penalty in the context of its findings on mitigation and aggravation, and required that trial courts thereafter make this clear by additional instruction. (P. 174.)[22] In the process the court made a passing reference to *Williams, supra,* 392 So.2d 619, but in context it would be unreasonable to interpret this as suggesting the court's approval of the *Williams* holding. Instead, it appears the *Durre* court cited *Williams* for the general proposition that a sentencing jury must be informed that its verdict for death must reflect the jury's unanimous agreement that death is warranted. (690 P.2d at p. 174.)

*Whalen* v. *State* (Del. 1985) 492 A.2d 552, is similar to *Durre.* In *Whalen,* the Delaware Supreme Court reversed a death sentence because, inter alia, the jury instructions did not adequately inform the jury—pursuant to the mandate of the United States Supreme Court—about the nature of aggravating and mitigating circumstances, the role of those factors in the jury's deliberations, and the jury's discretion to chose either death or life imprisonment. (492 A.2d at pp. 559-562.) Almost as an afterthought, the court cited *Williams, supra,* 392 So.2d 619, and suggested that additional instructional error occurred based on the failure of the instructions to inform the jury that if it did not unanimously agree on death, the trial court would impose life imprisonment. (*Id.,* at p. 562.)

In *Commonwealth* v. *Baker* (1986) 511 Pa. 1 [511 A.2d 777], the Pennsylvania Supreme Court reversed a penalty verdict because the prosecutor, in violation of *Caldwell* v. *Mississippi* (1985) 472 U.S. 320 [86 L.Ed.2d 231, 105 S.Ct. 2633], argued to the jury in such a way that it may have mistaken-

---

[22] Accord, *People* v. *Brown, supra,* 40 Cal.3d 512, 540-545; see also *Ramseur, supra,* 524 A.2d 188, 286-287.

ly believed that the ultimate responsibility for determining the appropriateness of a death sentence rested not with the jury, but with a reviewing court. The court observed in a footnote that, in addition to the *Caldwell* error which itself required reversal, the court was also "troubled" that defense counsel had not been summoned when the jury at one point reported it was deadlocked. The court suggested at least two things counsel might have done if present—including that counsel *"might . . .* have argued that special instructions had to be given to a hopelessly deadlocked jury informing them that if a unanimous death verdict could not be reached, that defendant would be sentenced to life imprisonment without parole. See, *State* v. *Williams . . . ."* (511 A.2d at p. 789, fn. 8, italics in original.) As with *Durre* and *Whalen,* we do not read this brief, uncritical dictum as suggesting the court's approval of the holding of *Williams.*

Other cases decided contemporaneously with *Williams* or shortly thereafter have rejected the assertion that a jury must, or should, be informed of the consequences of its failure to reach unanimity under death penalty statutes similar to the 1977 law. These decisions, unlike the post-*Williams* cases cited above, view the statutory provision at issue here in its procedural context and critically analyze, as we did in *Dixon,* the potential effect of such an instruction on a penalty jury.

In *State* v. *Adams* (1981) 277 S.C. 115 [283 S.E.2d. 582], the South Carolina Supreme Court rejected an assertion that the jury should have been instructed as advocated here, reasoning as follows: "The language of the statute provides that where a sentence of death is not recommended by the jury, a life sentence must be given. The situation implicitly envisioned here is that normally the jury will unanimously either recommend life or death. The undecided jury is the exception. *That portion of the statute addressing the legal effect given to the existence of an unalterably divided jury is addressed to the trial judge only and need not be divulged to the jury."* (*Id.,* at p. 587, italics added.)

The Alabama Court of Criminal Appeals soon thereafter echoed this theme: "The appellant correctly [notes] that '[i]f the jury cannot agree on a sentence of death, the defendant shall be sentenced to life imprisonment without parole.' [Citations.] *This mandate, however, is an instruction for the trial court, not for the jury."* (*Coulter* v. *State* (Ala.App. 1982) 438 So.2d 336, 346, italics added (affd. sub nom. *Ex Parte Coulter,* 438 So.2d 352).)

Similarly, the Virginia Supreme Court has held: "The court properly refused an instruction offered by the defendant which would have told the jury that if it could not reach agreement as to the appropriate punishment, the court would dismiss it and impose a life sentence. *While this was a*

*correct statement of law it concerned a procedural matter and was not one which should have been the subject of an instruction. It would have been an open invitation for the jury to avoid its responsibility and to disagree."* (*Justus v. Commonwealth* (1980) 220 Va. 971 [266 S.E.2d 87, 92], italics added; accord, *State* v. *Smith* (1982) 305 N.C. 691 [292 S.E.2d 264, 276].)

Finally, as the Supreme Court of Tennessee has observed, instructing a jury in the manner suggested by defendant would inject a constitutionally irrelevant consideration into the sentencing jury's penalty determination. (*Houston* v. *State* (Tenn. 1980) 593 S.W.2d 267.) In Tennessee, a statute provides (as did our 1977 death penalty law) that if the jury cannot agree on a sentence the trial court shall impose a sentence of imprisonment. It further provides, "The judge shall not instruct the jury, nor shall the attorneys be permitted to comment at any time to the jury, on the effect of the jury's failure to agree on a punishment." The *Houston* court held, "This statute does not deprive the jury of any knowledge of relevant evidence or aggravating circumstances or mitigating circumstances, necessary for them to fix punishment. It does no more than prevent the judge and counsel from informing the jury of the effect of its disagreement on which sentence should be imposed. *The after-effect of a jury's deliberation is not a proper consideration for the jury.* (*Id.*, at p. 278, italics added.)

We find these decisions persuasive, and we therefore agree with the People that *Dixon's* principles apply here. First, we agree the former statute contemplates that (i) juries will normally recommend either life or death, (ii) an unalterably undecided jury will be the exception, and (iii) in the event such an exception occurs, the statutory provision requiring that the court impose a sentence of life in prison without the possibility of parole is a procedural direction addressed to the trial court, not a substantive factor intended for the jury's consideration.[23]

Second, by parity of reasoning from our decision in *Dixon, supra,* 24 Cal.3d at page 53, we believe that if the court in the present case had instructed as defendant claims it should, any juror inclined against a finding that death was the appropriate penalty would have realized he could prevail simply by refusing to participate in good faith in the deliberations: by remaining obdurate and causing a jury deadlock, he would have in effect a veto power over the verdict. The likelihood of a minority juror's drawing this obvious inference far outweighs defendant's speculations as to what a jury uninformed on the point might have believed—i.e., that a juror

---

[23] For similar reasons, in *People* v. *Miranda, supra,* 44 Cal.3d 57, 105, we recently reaffirmed our holding in *People* v. *Harris* (1981) 28 Cal.3d 935, 963-964 [171 Cal.Rptr. 679, 623 P.2d 240], that a court is not required to instruct the jury, before deliberations begin, that it has a "third option"—i.e., a choice to deliver no verdict.

otherwise disposed against voting for death in a given case might discard his considered moral judgment simply to avoid the perceived necessity of a retrial.

The instruction now urged by defendant would thus have confused the jury's role in the penalty-determination process. We conclude the court did not err in its response to the jury's question, and in failing, sua sponte, to give the "clarifying" instruction advocated by defendant.

F. *Other Penalty Issues*

■ Defendant's remaining contentions are meritless. He claims that, in ruling on his automatic application for modification of the penalty, the court failed to give due consideration to evidence of aggravating and mitigating circumstances. The record, however, does not substantiate the assertion. The court considered mitigating evidence, including defendant's age, and properly weighed the mitigating and aggravating circumstances before denying the motion for modification.

■ Defendant claims juror Simpson was improperly excluded for cause. Again the record does not support the assertions. The challenged juror had expressed unequivocal opposition to the death penalty. (See *People* v. *Ghent* (1987) 43 Cal.3d 739, 767-769 [239 Cal.Rptr. 82, 739 P.2d 1250].) On a similar point, we have rejected defendant's claim that excusing prospective jurors who would automatically vote against the death penalty violates the Sixth Amendment. (See, e.g., *id.*, at pp. 753-754.)

■ We have also rejected defendant's claim that the court should have deleted assertedly "inapplicable" factors from former CALJIC No. 8.88.1 (*id.*, at pp. 776-777) and we have recently rejected defendant's argument that due process requires a jury finding beyond a reasonable doubt that the aggravating circumstances outweigh the mitigating circumstances and that death is the appropriate penalty. *(Rodriguez, supra,* 42 Cal.3d at pp. 777-779.)

■ Finally, the substance of defendant's claim that the 1977 death penalty law violates the Eighth and Fourteenth Amendments because it fails to guide the jury's sentencing discretion has been rejected in *People* v. *Jackson* (1980) 28 Cal.3d 264, 315-317 [168 Cal.Rptr. 603, 618 P.2d 149], and *People* v. *Frierson* (1979) 25 Cal.3d 142, 172-188 [158 Cal.Rptr. 281, 599 P.2d 587] (plur. opn.).

## V. CONCLUSION

For the reasons discussed above, the judgment is affirmed in its entirety.

Panelli, J., Arguelles, J., Eagleson, J., and Kaufman, J., concurred.

**MOSK, J.**—I concur in the judgment insofar as it affirms defendant's conviction. I dissent, however, insofar as it affirms the imposition of the penalty of death.

I agree with the majority that the judgment should be affirmed as to guilt: in my view, there occurred no prejudicial error bearing on that issue. I also agree that defendant is eligible for the death penalty: one of the multiple-murder special-circumstance findings is unquestionably valid. But I cannot agree that the judgment should be affirmed as to penalty: for the reasons stated in Justice Broussard's concurring and dissenting opinion, I believe that errors were committed at the penalty phase and that those errors resulted in a "miscarriage of justice" within the meaning of article VI, section 13, of the California Constitution.

I write separately, however, to express my disagreement with the majority's conclusion that the felony-murder special-circumstance findings in this case are valid.

To begin with, advancement of an independent felonious purpose is plainly an element of the felony-murder special circumstance and, as such, should have been instructed on in connection with each of the felony-murder special circumstances alleged in this case. That point was established by this court in *People* v. *Green* (1980) 27 Cal.3d 1 [164 Cal.Rptr. 1, 609 P.2d 468], and has been recognized, for example, by the Committee on Standard Jury Instructions—Criminal. In *Green,* the court squarely held that the felony-murder special circumstance must be construed to require a finding of independent felonious purpose. (*Id.* at pp. 61-62.) Pursuant to *Green,* CALJIC No. 8.81.17 requires the jury to find "That the murder was committed in order to carry out or advance the commission of the [underlying felony] or to facilitate the escape therefrom or to avoid detection." Thus, in light of the *Green* holding, the majority's attempt to present advancement of an independent felonious purpose as merely a kind of nonessential "clarifying" or "amplifying" gloss is unsuccessful.

Further, I believe that failure to instruct on the independent-felonious-purpose element is not subject to general harmless error analysis, and that on this record the error cannot be held nonprejudicial. My reasons are as follows.

In *People* v. *Garcia* (1984) 36 Cal.3d 539 [205 Cal.Rptr. 265, 684 P.2d 826], the court held that failure to instruct on an element of a special circumstance was in general automatically reversible. (*Id.* at p. 554.) At the

same time the court recognized that there appeared to be certain exceptions to this rule. One was that the erroneous instruction was given in connection with a special circumstance allegation that was not found true, and had no bearing on the special circumstance that was found true—the so-called "acquittal exception." (*Id*. at pp. 554-555.) Another exception was that the defendant conceded the issue of intent—the so-called "concession exception." (*Id*. at p. 555.) Yet another was that the issue was necessarily resolved adversely to the defendant under other, properly given instructions—the so-called "*Sedeno* exception" (*People* v. *Sedeno* (1974) 10 Cal.3d 703 [112 Cal.Rptr. 1, 518 P.2d 913]). (*People* v. *Garcia, supra,* 36 Cal.3d at p. 555.) The court also tentatively recognized as a fourth exception that intent was established as a matter of law and there was no contrary evidence worthy of consideration—the so-called "*Cantrell-Thornton* exception" (*People* v. *Cantrell* (1973) 8 Cal.3d 672 [105 Cal.Rptr. 792, 504 P.2d 1256]; *People* v. *Thornton* (1974) 11 Cal.3d 738 [114 Cal.Rptr. 467, 523 P.2d 267]). (*People* v. *Garcia, supra,* 36 Cal.3d at pp. 555-557.)

In so holding the *Garcia* court applied principles enunciated by the United States Supreme Court in a line of decisions including *Sandstrom* v. *Montana* (1979) 442 U.S. 510 [61 L.Ed.2d 39, 99 S.Ct. 2450], and *Connecticut* v. *Johnson* (1983) 460 U.S. 73 [74 L.Ed.2d 823, 103 S.Ct. 969], which bear on the question whether the due process clause is offended by presumptions, burdens of proof, and other procedural mechanisms that allow the state to establish an element of a crime with something less than proof beyond a reasonable doubt.

The *Garcia* court commenced its analysis with the observation that just as a murder instruction creating a presumption of malice—so-called "*Sandstrom* error"—violates due process, so too does the failure to instruct on an element and the consequent removal of the issue from the jury. (36 Cal.3d at pp. 550-551.) The court explained: Although *Sandstrom, supra,* 442 U.S. 510, *Connecticut* v. *Johnson, supra,* 460 U.S. 73, et alia, examined "presumptions, burdens of proof, and other procedural analogs to a directed verdict," their underlying reasoning "would invalidate any instruction or failure to instruct which would permit the state to circumvent the requirement that it prove every fact necessary for conviction beyond a reasonable doubt. [Citation.] Thus a failure to instruct on the element of intent, because it would permit the jury to find guilt without proof of intent beyond a reasonable doubt, would constitute a denial of due process." (36 Cal.3d at p. 551.)

Next, although plainly recognizing that a special circumstance bears on penalty, the *Garcia* court analogized a special circumstance and its elements to a crime and its elements—and appears to have implied that as a matter of

state law the former were similar in nature and function to the latter. (*Id.* at p. 552.)

The court acknowledged that technically "a special circumstance is not a 'crime,' and an element of a special circumstance thus is not an 'element of a crime.'" (*Ibid.*) It added, however, that there was a "resemblance between a special circumstance proceeding and a trial to determine guilt. . . . 'In the California scheme the special circumstance . . . is a fact or set of facts, found beyond reasonable doubt by a unanimous verdict [citation], which changes the crime from one punishable by imprisonment of 25 years to life to one which must be punished either by death or life imprisonment without possibility of parole . . . .'" (*Ibid.*) As the court suggested, just as the defendant has a right to a jury determination of his guilt or innocence of a crime under the federal Constitution, so too does he have what may variously be termed a right to, a liberty interest in, or an entitlement to, a jury determination of the existence of a special circumstance under state law (Pen. Code, § 190.4, subd. (a)).

The court concluded: "In view of the importance of a special circumstance finding, we do not believe the courts can extend a defendant less protection with regard to the elements of a special circumstance than for the elements of a criminal charge. If failure to instruct on the element of a crime is a denial of federal due process, the same consequence should attend failure to instruct on the element of a special circumstance." (*People* v. *Garcia, supra,* 36 Cal.3d at p. 552.)

Finally, the *Garcia* court looked to *Connecticut* v. *Johnson, supra,* 460 U.S. 73. "The test of prejudice for *Sandstrom* error is yet to be formulated. When the issue reached the United States Supreme Court in *Connecticut* v. *Johnson,* [citation], that court divided evenly. Justice Blackmun, joined by Justices Brennan, Marshall, and White, took the position that *Sandstrom* error would be harmless only in rare cases, such as one in which the defendant conceded the issue of intent; in all other cases, the conviction must be reversed regardless of the weight of the evidence. Justice Powell, joined by the Chief Justice, Justice Rehnquist and Justice O'Connor, argued in favor of the *Chapman* [v. *California* (1967) 386 U.S. 18 (17 L.Ed.2d 705, 87 S.Ct. 824, 24 A.L.R.3d 1065)] standard . . . . Justice Stevens, the tie-breaking vote, did not address the test of prejudice required by the federal Constitution; he maintained that Connecticut's application of a test requiring per se reversal violated no federal rights even if it went beyond federal constitutional requirements. Justice Stevens thus voted with the majority to affirm the Connecticut court's reversal of defendant's conviction for attempted murder.

"The trial court in *Connecticut* v. *Johnson* had instructed the jury that ' "every person is conclusively presumed to intend the natural and necessary consequences of his act." ' [Citation.] The plurality opinion by Justice Blackmun reasoned that this instruction was the equivalent of a directed verdict on the issue of intent, and that since a directed verdict is impermissible regardless of the weight of the evidence, the conviction must be reversed despite overwhelming evidence of guilt. . . .

"The dissent agreed that an instruction which 'removes an issue completely from the jury's consideration' [citation] would require automatic reversal, but maintained that the instruction given by the Connecticut judge did not go that far. Unlike a directed verdict, argued the dissent, the Connecticut presumption did not take the issue wholly from the jury. That presumption established only that the defendant intended the natural and necessary consequences of his acts, leaving it to the jury to determine the nature of those consequences.

"The dissent, as we read it, draws a fine distinction. It concedes that an instruction which operated independently from the evidence, directing or permitting the jury to find intent without examining the evidence, would be reversible per se. On the other hand, it asserts, a presumption which takes effect only if the jury finds certain preliminary facts does not permit the jury to avoid examining the evidence and should therefore be subject to a less stringent standard of prejudice. . . .

"The dissent's distinction leads us to conclude that at least eight justices of the United States Supreme Court (all except Justice Stevens, who took no position on the issue) agree that a jury instruction which does take an issue completely from the jury is reversible per se. We have no doubt that they would reach the same conclusion if the error was one of omission—failing to submit the issue of intent to the jury. Both forms of error have the same effect: removing the issue wholly from jury determination, and thus denying defendant the right to jury trial on the element of the charge." (36 Cal.3d at pp. 552-554, fn. omitted.)

On the basis of the foregoing reasoning, the *Garcia* court concluded that under the federal Constitution failure to instruct on an element of a special circumstance would generally be reversible per se. (*Id.* at p. 554.) It noted, however, that certain exceptions might be available to the rule of automatic reversal. It observed that the *Connecticut* v. *Johnson* plurality itself suggested the acquittal and concession exceptions. (*Id.* at pp. 554-555.) It opined that "in an appropriate case, the United States Supreme Court would accept [the *Sedeno*] exception . . . ." (*Id.* at p. 555.)

As to the *Cantrell-Thornton* exception, however, the *Garcia* court was not as confident. "We are uncertain whether the United States Supreme Court will endorse the *Cantrell-Thornton* exception to its apparent rule favoring automatic reversal. The four dissenting justices in *Connecticut v. Johnson* [citation], accused the plurality of requiring 'reversals of convictions in many situations in which the defendant's actions establish intent as conclusively as if it were unequivocally conceded.' [Citation.] The plurality did not respond to this charge. The making of the accusation suggests that four justices of the court would be sympathetic to a limited exception that would avoid retrial in some cases in which the evidence unequivocally and conclusively established intent, but leaves it uncertain whether a majority would take that position." (36 Cal.3d at pp. 556-557.)

In light of this uncertainty, the *Garcia* court gave the *Cantrell-Thornton* exception only tentative recognition: "pending further guidance from the United States Supreme Court, we will apply the reasoning of *Cantrell* and *Thornton* only to those cases clearly falling within the ambit of that reasoning so as not to detract substantially from the per se character of the high court's rule." (*Id.* at p. 557.)

In *Rose v. Clark* (1986) 478 U.S. 570 [92 L.Ed.2d 460, 106 S.Ct. 3101], the United States Supreme Court has given such further guidance.[1] There the high court, resolving the question it had considered but left unanswered in *Connecticut v. Johnson,* held that *Sandstrom* error was subject to harmless-error analysis under the *Chapman* test. This holding is not itself apposite to the question at bar. As both this court and the United States Supreme Court have recognized, *Sandstrom* error—which involves an impermissible presumption as to malice, but does not remove the issue from the jury's consideration—is fundamentally different from the error considered here—which does in fact effectively remove an issue from the jury. (*Rose v. Clark, supra,* 478 U.S. at pp. 580-581 & fn. 8 [92 L.Ed.2d at pp. 472-473 & fn. 8, 106 S.Ct. at pp. 3107-3108 & fn. 8]; *Connecticut v. Johnson, supra,* 460 U.S. at p. 95, fn. 3 [74 L.Ed.2d at p. 840, fn. 3] (dis. opn. of Powell, J.); *People v. Garcia, supra,* 36 Cal.3d at pp. 552-554; see *Pope v. Illinois* (1987) 481 U.S. 497, __ [95 L.Ed.2d 439, 446, 107 S.Ct. 1918, 1922] [distinguishing between an instruction that, though erroneous, does not remove an issue from the jury's consideration and an instruction that does remove an issue];

---

[1] In their petition for a writ of certiorari in *People v. Hamilton* (1985) 41 Cal.3d 408 [221 Cal.Rptr. 902, 710 P.2d 981], the People presented the following question: "What is the proper standard of prejudice under the United States Constitution for errors in jury instructions regarding intent to kill in capital cases?" The high court handed down *Rose* and then granted the People's petition, vacated the judgment, and remanded the case for further consideration in light of that decision. (*California v. Hamilton* (1986) 478 U.S. 1017 [92 L.Ed.2d 734, 106 S.Ct. 3328].)

*Cabana* v. *Bullock* (1986) 474 U.S. 376, 384-385 [88 L.Ed.2d at p. 715, 106 S.Ct. 689, 696] ["Findings made by a judge cannot cure deficiencies in the jury's findings as to guilt or innocence of a defendant resulting from the court's failure to instruct it to find an element of the crime"].)

Although the holding of *Rose* is not itself apposite, the reasoning on which it rests is. In that case, the high court stated that constitutional errors are generally subject to harmless-error analysis under the *Chapman* test. (478 U.S. at pp. 577-578 [92 L.Ed.2d at p. 470, 106 S.Ct. at pp. 3105-3107].) But to this rule, the court acknowledged, there were two exceptions.

"Despite the strong interests that support the harmless-error doctrine, the Court in *Chapman* recognized that some constitutional errors require reversal without regard to the evidence in the particular case. [Citations.] This limitation recognizes that some errors necessarily render a trial fundamentally unfair. The State of course must provide a trial before an impartial judge, [citation], with counsel to help the accused defend against the State's charge, [citations]. Without these basic protections, a criminal trial cannot reliably serve its function as a vehicle for determination of guilt or innocence, [citation], and no criminal punishment may be regarded as fundamentally fair. Harmless-error analysis thus presupposes a trial, at which the defendant, represented by counsel, may present evidence and argument before an impartial judge and jury. [Citations.]

"Similarly, harmless-error analysis presumably would not apply if a court directed a verdict for the prosecution in a criminal trial by jury. We have stated that 'a trial judge is prohibited from entering a judgment of conviction or directing the jury to come forward with such a verdict . . . regardless of how overwhelmingly the evidence may point in that direction.' [Citations.] This rule stems from the Sixth Amendment's clear command to afford jury trials in serious criminal cases. [Citation.] Where that right is altogether denied, the State cannot contend that the deprivation was harmless because the evidence established the defendant's guilt; the error in such a case is that the wrong entity judged the defendant guilty." (478 U.S. at p. 578 [92 L.Ed.2d at p. 471, 106 S.Ct. at p. 3106], fn. omitted].)

Under the second or "directed verdict" exception falls the error considered here—the failure to instruct on an element of a special circumstance and the consequent removal of that issue from the jury's consideration. That the error here effectively removes only one of the elements of the special circumstance, as opposed to the special circumstance as a whole, does not place it outside the scope of this exception. As the *Rose* court itself plainly implied, the removal of even a single element would be tantamount to a directed verdict as to that element and would therefore require

automatic reversal. (478 U.S. at pp. 579-580 & fn. 8 [92 L.Ed.2d at pp. 471-472, & fn. 8, 106 S.Ct. at pp. 3107-3108 & fn. 8]; accord, *Cabana* v. *Bullock, supra,* 474 U.S. at p. 384 [88 L.Ed.2d at p. 715, 106 S.Ct. at p. 696].)[2]

It could perhaps be argued that the foregoing analysis is inapposite and hence does not support a rule of automatic reversal. Such an argument might run as follows: a special circumstance bears not on guilt but solely on penalty; a criminal defendant does not have a Sixth Amendment right to a jury determination of penalty; hence, the removal of a special circumstance, in whole or in part, from the jury's consideration does not implicate the Sixth Amendment; therefore, the error considered here does not require automatic reversal. Such an argument, however, would fail.

To begin with, I do not believe the premise of the argument is valid. I recognize, as did the *Garcia* court (36 Cal.3d at pp. 551-552), that a special circumstance bears on penalty. But as that court implied, as a matter of state law a special circumstance and its elements are similar in nature and function to a crime and its elements. (*Ibid.*) Moreover, under state law a special circumstance is treated as an element of capital murder. (*In re Boyle* (1974) 11 Cal.3d 165, 167-169 [113 Cal.Rptr. 99, 520 P.2d 723] [construing former Pen. Code, § 1270]; *In re Freeman* (1980) 102 Cal.App.3d 838, 840 [162 Cal.Rptr. 423] [same].)

But even if I should assume for argument's sake that the premise is valid, I believe that the error considered here would nevertheless require automatic reversal on due process grounds under the reasoning of *Cabana* v. *Bullock, supra,* 474 U.S. 376.

In *Bullock* the United States Supreme Court held that "If a person sentenced to death in fact killed, attempted to kill, or intended to kill, the Eighth Amendment [, as construed in *Enmund* v. *Florida* (1982) 458 U.S. 782 [73 L.Ed.2d 1140, 102 S.Ct. 3368] . . . is not violated by his or her execution regardless of who makes the determination of the requisite culpability . . . ." (474 U.S. at p. 386 [88 L.Ed.2d at p. 716, 106 S.Ct. at p. 697].) In so holding, the court rejected the proposition that "*Enmund* can be satisfied only at a sentencing hearing and by a jury's decision . . . that the defendant possessed the requisite culpability." (*Id.* at p. 384 [88 L.Ed.2d at p. 715, 106 S.Ct. at p. 696].)

---

[2] I recognize that the *Rose* court introduced its "directed verdict" exception in apparently tentative language: "Similarly, harmless-error analysis *presumably* would not apply if a court directed a verdict for the prosecution . . . ." (478 U.S. at p. 578 [92 L.Ed.2d at p. 471, 106 S.Ct. at p. 3106], italics added.) The remainder of the paragraph, however, is written in language that is firm and categorical. Accordingly, I do not believe that one can reasonably read a single word to undermine the existence of the exception.

The *Bullock* court reasoned: "A defendant charged with a serious crime has the right to have a jury determine his guilt or innocence [citation], and a jury's verdict cannot stand if the instructions provided the jury do not require it to find each element of the crime under the proper standard of proof [citation]. Findings made by a judge cannot cure deficiencies in the jury's finding as to the guilt or innocence of a defendant resulting from the court's failure to instruct it to find an element of the crime. [Citations.] But our ruling in *Enmund* does not concern the guilt or innocence of the defendant—it establishes no new elements of the crime of murder that must be found by the jury. Rather, . . . *Enmund* 'does not affect the state's definition of any substantive offense, even a capital offense.' [Citations.] *Enmund* holds only that the principles of proportionality embodied in the Eighth Amendment bar imposition of the death penalty upon a class of persons who may nonetheless be guilty of the crime of capital murder as defined by state law: that is, the class of murderers who did not themselves kill, attempt to kill, or intend to kill. [¶] The decision whether a particular punishment—even the death penalty—is appropriate in any given case is not one that we have ever required to be made by a jury." (474 U.S. at pp. 384-385 [88 L.Ed.2d at pp. 715-716, 106 S.Ct. at pp. 696-697], fn. omitted].)

The *Bullock* court went on to explain how its holding affects the scope of federal habeas corpus review: "when a federal habeas court reviews a claim that the death penalty has been imposed on one who has neither killed, attempted to kill, nor intended that a killing take place or lethal force be used, the court's inquiry cannot be limited to an examination of jury instructions. Rather, the court must examine the entire course of the state-court proceedings against the defendant in order to determine whether, at some point in the process, the requisite factual finding as to the defendant's culpability has been made. If it has, the finding must be presumed correct . . . , and unless the habeas petitioner can bear the heavy burden of overcoming the presumption, the court is obliged to hold that the Eighth Amendment as interpreted in *Enmund* is not offended by the death sentence." (474 U.S. at pp. 387-388 [88 L.Ed.2d at pp. 717-718, 106 S.Ct. at pp. 697-698], fn. omitted.)

In footnote 4, the court majority responded to Justice Blackmun's dissent: "Justice Blackmun's reliance on *Hicks* v. *Oklahoma,* (1980) 447 U.S. 343 [65 L.Ed.2d 175, 100 S.Ct. 2227], and *Presnell* v. *Georgia,* (1978) 439 U.S. 14 [58 L.Ed.2d 207, 99 S.Ct. 235], for the proposition that state appellate courts may not supply essential findings that the jury has omitted is, as applied in this case, misguided. In *Hicks,* we held only that where state law creates for the defendant a liberty interest in having the jury make particular findings [bearing on penalty], the Due Process Clause implies that appellate findings do not suffice to protect that entitlement. Unlike the defendant

in *Hicks,* Bullock had no state-law entitlement at the time of this trial to have the jury (or, indeed, anyone at all) make the *Enmund* findings. Of course, federal law, as later established by *Enmund,* does entitle Bullock to a determination whether he killed, attempted to kill, intended to kill, or intended that lethal force be used; but, for the reasons explained in the text, the federal-law entitlement, unlike the state-law entitlement involved in *Hicks,* does not specify who must make the findings.

"In *Presnell,* the defendant was convicted on charges of murder and kidnapping with bodily injury, and was sentenced to death by the jury. The sole aggravating factor supporting the death penalty for murder was the fact that the defendant was also guilty of kidnapping with bodily injury. The Georgia Supreme Court found that the jury had been wrongly instructed on the elements of kidnapping with bodily injury, but affirmed both the conviction for that crime and the use of the crime as an aggravating factor on the ground that the evidence was sufficient to support the jury's findings under a theory on which the jury had not been instructed. We set aside both the conviction and the death sentence on the authority of *Cole* v. *Arkansas, supra,* [333 U.S. 196 (1948)], which held that it was constitutional error for a state court to affirm a conviction for one offense on the basis of evidence in the record indicating that the defendant had committed another offense on which the jury had not been instructed. Insofar as it merely applied *Cole* in setting aside the defendant's conviction for kidnapping with bodily injury, *Presnell* is unremarkable and has little to do with this case. [Citation.] But in reversing as well the death sentence on the ground that the Georgia Supreme Court could not find an aggravating factor on a theory on which the jury had not been instructed, the *Presnell* Court appeared to assume that the jury's constitutional role in determining sentence was equivalent to its role in determining guilt or innocence. This assumption, of course, is no longer tenable in light of our holding in *Spaziano* v. *Florida,* 468 U.S. 447 (1984)." (*Cabana* v. *Bullock, supra,* 474 U.S. at pp. 387-388, fn. 4 [88 L.Ed.2d at p. 717, fn. 4, 106 S.Ct. at pp. 697-698, fn. 4].)

In the foregoing language the United States Supreme Court has clearly shown that failure to instruct on an element of a special circumstance requires automatic reversal, and that the *Cantrell-Thornton* exception—under which a reviewing court holds the error harmless essentially by making a finding that the jury did not make—can no longer be recognized: when, as in California, "state law creates for the defendant a liberty interest in having the jury make particular findings [bearing on penalty], the Due Process Clause implies that appellate findings do not suffice to protect that entitle-

ment." (*Cabana* v. *Bullock, supra,* 474 U.S. at p. 387, fn. 4 [88 L.Ed.2d at p. 717, fn. 4, 106 S.Ct. at pp. 697-698, fn. 4].)[3]

For the foregoing reasons, I would reaffirm the *Garcia* rule of automatic reversal, but hold that the *Cantrell-Thornton* exception is no longer to be recognized.

I turn now to the facts of the case at bar. Unless an exception to the rule of automatic reversal is satisfied, the felony-murder special-circumstance findings should be vacated without consideration of specific prejudice. In my opinion, none of the surviving exceptions is available on this record: first, the erroneous instruction was given in connection with each of the felony-murder special-circumstance allegations found to be true; second, defendant did not concede the issue of independent felonious purpose; third, the issue was not necessarily resolved adversely to him under other, properly given instructions—indeed, it was not even presented for the jury's consideration.

In summary, I would hold that the trial court erred by failing to instruct on independent felonious purpose with regard to the felony-murder special-circumstance allegations. I would further hold that on this record the error cannot be deemed harmless.

In conclusion, I concur in the judgment as to guilt. I would hold that one of the multiple-murder special-circumstance findings is valid, but that the felony-murder special-circumstance findings are not. And I dissent from the judgment as to penalty.

**BROUSSARD, J.**—I concur in the judgment insofar as it affirms the convictions and the special circumstances findings. I dissent from the affirmance of the death judgment.

I agree with the majority that in the list of aggravating and mitigating factors contained in Penal Code section 190.3, factor (b) "[t]he presence or absence of criminal activity by the defendant which involved the use or attempted use of force or violence" (former § 190.3, 5th par., subd. (b)) does not refer to the crimes involved in the charged case. If the rule were otherwise, as the majority write, the statute would contain overlapping aggravating factors, since factor (a) in the list allows the jury to consider the circumstances of the charged crime in aggravation. I agree that overlapping

---

[3] In *Pope* v. *Illinois, supra,* 481 U.S. 497, the United States Supreme Court stated that to the extent *Bullock* indicated that *Sandstrom* error was reversible per se it was no longer good authority after *Rose.* (*Id.* at p. __, fn. 7 [95 L.Ed.2d at p. 447, 107 S.Ct. at p. 1922].) This statement, of course, has no effect on my analysis.

and repetitive aggravating factors may fail to guide and focus the jury's penalty determination adequately, and may unnecessarily and prejudicially inflate the aggravating circumstances.

However, I cannot agree that the prosecutor's use of the circumstances of the charged crime as a circumstance in aggravation under factor (b) was harmless error in this case. The record contains no evidence of other violent criminal activity, and no prior conviction was presented to the jury. Thus the jury should have considered factor (b) as a factor in mitigation, but instead, the prosecution erroneously argued that it was an aggravating factor.

When a jury is misled into treating a substantial mitigating factor as a factor in aggravation, the error may well be prejudicial. In this case, the prosecutor presented no evidence at the penalty phase. On the other hand, the defendant was able to demonstrate that he had been a caring, responsible, and much-loved member of his family, and a generous member of his community, giving time to children and the ailing elderly. The prosecutor's theme in closing argument was that defendant's real and enduring character was disclosed by the circumstances of the charged crime, and that defendant was a vicious criminal who was capable of behaving normally 95 percent of the time. There is a substantial possibility that his use of the charged crimes to displace the jury's consideration of what should have been a circumstance in mitigation affected the verdict by artificially inflating a less than overwhelming case in aggravation.

But this was not the only serious error in the penalty phase. The court responded to a jury question during deliberation by directing the jury to consider only the statutory factors in aggravation and mitigation. This gave the jury the false impression that defendant's character and background evidence was irrelevant. (See *People* v. *Easley* (1983) 34 Cal.3d 858 [196 Cal.Rptr. 309, 671 P.2d 813].) The court's response also directed the jury not to consider the appropriateness of the death penalty in this case. (See *People* v. *Brown* (1985) 40 Cal.3d 512, 540 [230 Cal.Rptr. 834, 726 P.2d 516] (revd. on other grounds *sub nom. California* v. *Brown* (1987) 479 U.S. 538 [93 L.Ed.2d 934, 107 S.Ct. 837].)

During deliberation, the jury asked: "[Are] there any further criteria that can be used to determine one penalty as opposed to the other or is it simply the matter of our personal choice?" Over defense objection, the court responded by repeatedly telling the jury that the penalty decision was not a matter of their personal choice, and that the guidelines set out in the

instructions (which were in the terms of the statute) were the only criteria they could use.[1]

We have held that the 1978 death penalty initiative, now codified as Penal Code sections 190-190.5, may give the impression that the list of factors in aggravation and mitigation is exclusive. Thus, the statute must be augmented with a jury instruction that defense character and background evidence may be considered as a basis for a sentence less than death, even if the evidence does not, in the terms of the statute, " 'extenuate[ ] the gravity of the crime.' " (*People* v. *Easley, supra,* 34 Cal.3d 858, 878, fn. 10; see also *People* v. *Davenport* (1985) 41 Cal.3d 247, 282-283 [221 Cal.Rptr. 794, 710 P.2d 861].) We have never considered such an instruction necessary in cases tried under the predecessor to the 1978 death penalty initiative. The earlier law did not explicitly limit the jury's consideration to the listed factors. "Under the 1977 version of section 190.3, the jury must 'consider, take into account and be guided by the aggravating and mitigating circumstances' enumerated in that section. The statute, however, provided no further guidance or limitation on the jury's sentencing discretion. In the absence of such a limitation, the jury was free, after considering the listed aggravating and mitigating factors, to consider any other matter it thought relevant to the penalty determination. The 1978 initiative, by contrast, provided specifically that the jury 'shall impose a sentence of death if [it] concludes that the aggravating circumstances outweigh the mitigating circumstances. . . .' By thus requiring the jury to decide the appropriateness of the death penalty by a process of weighing the specific factors listed in the statute, the initiative necessarily implied that matters not within the statutory list are not entitled to any weight in the penalty determination." (*People* v. *Boyd* (1985) 38 Cal.3d 762, 773, fn. omitted [215 Cal.Rptr. 1, 700 P.2d 782].)

The court's response to the jury's question in this case, as it told jurors that no criterion could be used unless it appeared in the list noted in the

---

[1] The trial court's entire answer was: "It is not a matter of your personal choice. At the time that you were sworn you were sworn to follow the law as I read it to you. This takes it out of the province of it being your personal choice.

"You are to follow the law, regardless of what your personal choice may be.

"I again will emphasize there is no further criteria other than the instructions that have previously been given you, and I will read the instructions again to you. [Court rereads penalty instructions.]

"Ladies and gentlemen of the jury, I read the guidelines that are set forth by law. You are to use those guidelines and reach your decision. There is no further criteria that I can give you, and you are not to simply make it a matter of your personal choice. The choice must be according to the law that I have given to you. Regardless of what your personal choice in any given situation might be, that's not your duty. Your duty is not to follow your personal choice, but you are to follow what the law states that you must do, and that is what I have read to you in your instructions. Thank you. You may retire."

instruction, destroyed the open-ended quality of the 1977 statute. The jury's question made it clear that it was confused by the standard instruction in the terms of the statute. Obviously the district attorney's arguments had not helped to eliminate the confusion. Instead of offering any clarification, the court required the jury to be guided only by the statutory factors. This created a certainty that the jury would think that character and background evidence not related to defendant's culpability for the charged offense was irrelevant, since these are not mentioned as statutory criteria.

An even graver error occurred when the court repeatedly admonished the jury that they should not rely on their personal choice, but on the listed statutory criteria. In *People* v. *Brown, supra,* 40 Cal.3d 512, 540 (revd. on other grounds *sub nom. California* v. *Brown* (1987) 479 U.S. 538 [93 L.Ed.2d 934, 107 S.Ct. 837]), we held that the jury deciding penalty must be "free to reject death if it decides on the basis of any constitutionally relevant evidence or observation that it is not the appropriate penalty. Moreover, the decision is the responsibility of the jury and no one else." A statute which "forced the jury to impose death on any basis other than their own judgment that such a verdict was appropriate" would be unconstitutional. (*Id.*) One of our concerns was that an instruction in the language of the 1978 initiative, telling jurors that if they find that aggravating circumstances outweigh mitigating, they "shall" impose the death penalty, might cause a juror to " 'determine whether "the aggravating circumstances outweigh the mitigating circumstances" without regard to the juror's *personal views* as to the appropriate sentence, and then [ ] to impose a sentence of death if aggravation outweighs mitigation even if the juror does not personally believe that death is the appropriate sentence under all the circumstances . . . .' " (*People* v. *Myers* (1987) 43 Cal.3d 250, 274 [233 Cal.Rptr. 264, 729 P.2d 698], italics added.)

Obviously, personal choice in the sense of a subjective analysis of whether death is the appropriate penalty must enter into the jury's penalty determination. We are normally confident that a jury hearing a case tried under the 1977 death penalty statute would understand this. But this jury not only did not understand that the listed factors were not exclusive, but was not certain whether subjective factors could enter into the penalty determination. The court gave the wrong answer on both points of confusion. Again, since the jury asked the question after the commencement of deliberations, it is obvious that the district attorney's argument had not successfully elucidated the matter, and the majority's reliance on this argument is misplaced.

The majority find the jury's question ambiguous. In light of the ambiguity, they say that it was "proper for the court to make it clear to the jury

that it was required to consider and be guided by the enumerated factors, and that it could not simply disregard those factors in determining penalty." (Maj. opn. at p. 507.) The majority suggest that without the court's response, the jury might have thought it was to decide penalty on the basis of a whim, in violation of the strictures of *Furman* v. *Georgia* (1972) 408 U.S. 238 [33 L.Ed..2d 346, 92 S.Ct. 2726]. While I agree that the jury's question may have required the court to inform the jury that it should not make the penalty determination arbitrarily, on the basis of personal whim, I do not agree that the court's actual response performed this function. Instead, by telling the jury over and over again that personal choice should not enter into the calculus, and that only the statutory factors should be consulted, the court gave the unmistakable impression that there was no subjective element to the determination.

We normally assume that jurors follow the court's instructions. If we follow that assumption, these jurors would have disregarded defendant's mitigating evidence since it did not come under the statutory factor of evidence that extenuated the gravity of the crime. They would have attempted to eliminate any subjective analysis of the appropriateness of the death penalty in this case, and instead would have engaged in a mechanical weighing of the statutory factors. In addition, the district attorney's argument almost certainly caused them to disregard a substantial factor in mitigation, that is, the lack of other violent criminal activity, and instead, to artificially inflate the number of aggravating factors that they weighed. Applying any standard of review, it is a miscarriage of justice to affirm this death penalty judgment.

Appellant's petition for a rehearing was denied April 21, 1988. Mosk, J., and Broussard, J., were of the opinion that the petition should be granted.