Filed 5/14/14  P. v. Bates CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>ROBERT LEE BATES,<br><br>    Plaintiff and Respondent,<br>_____<br><br>In re ROBERT LEE BATES,<br><br>    On Habeas Corpus. | B248961<br><br>(Los Angeles County<br>Super. Ct. No. BA388177)<br><br><br><br>B252513 |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Monica Bachner, Judge.  Affirmed.  ORIGINAL PROCEEDING; petition for writ of habeas corpus.  Writ denied.

Matthew Alger, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Scott A. Taryle and Kimberley J. Baker-Guillemet, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant and appellant Robert Lee Bates (defendant) appeals from his rape convictions, claiming prejudice due to the exclusion of evidence suggesting that one of the victims was a prostitute and a drug user. Defendant also contends that his trial counsel's representation was constitutionally defective due to a failure to file a written motion to present the evidence which was excluded, and due to his failure to object to the admission of arrests to impeach defendant's credibility. Defendant has also filed a petition for writ of habeas corpus alleging ineffective assistance of counsel. We have ordered the habeas petition to be considered with this appeal for the sole purpose of determining whether an order to show cause should issue. We find no merit to defendant's contentions on appeal nor has he shown a prima facie case for habeas relief. We thus summarily deny the petition for habeas corpus and affirm the judgment.

## BACKGROUND

**Procedural history**

Defendant was charged with committing the following three crimes against Renee M. (Renee): count 1, kidnapping to commit rape in violation of Penal Code section 209, subdivision (b)(1);[1] count 2, forcible oral copulation in violation of section 288a, subdivision (c)(2); and count 3, forcible rape in violation of section 261, subdivision (a)(2). The information also charged defendant with committing the following three crimes against Vanessa C. (Vanessa): count 4, kidnapping to commit rape in violation of section 209, subdivision (b)(1); and counts 5 and 6, forcible rape in violation of section 261, subdivision (a)(2). As to counts 2 through 6, it was alleged that defendant committed the offense against more than one victim, within the meaning of section 667.61, subdivisions (a) and (e). As to counts 5 and 6, it was further alleged that defendant had personally used a firearm in the commission of the offenses within the meaning of section 12022, subdivision (b)(1), and for purposes of section 667.61, subdivision (a).

---

[1] All further statutory references in this section are to the Penal Code, unless otherwise indicated.

2

The trial court declared a mistrial early in defendant's first jury trial. The second jury found defendant guilty of all six counts as charged, and found true the allegations that defendant had personally used a firearm or deadly or dangerous weapon and had committed the crimes against more than one victim. On May 14, 2013, the trial court sentenced defendant to a total term of 50 years to life in prison. The court selected count 2 as the base term, imposing 25 years to life pursuant to section 667.61, subdivision (a), and then a concurrent term of 25 years to life as to count 3. Defendant received a life term as to each of counts 1 and 4, which the trial court stayed pursuant to section 654. As to each of counts 5 and 6, the court sentenced defendant to 25 years to life pursuant to section 667.61, subdivision (a), with count 5 to run consecutively to the terms imposed as to counts 2 and 3, and count 6 to run concurrently with count 5. Defendant was given a total of 719 days of presentence custody credit, comprised of 626 days of actual time served and 93 days of local conduct credit. Defendant was ordered to pay mandatory fines and fees, register as a sex offender, and provide fingerprints, a DNA sample, and an AIDS test. The court scheduled a later hearing on victim restitution. Defendant filed a timely notice of appeal from the judgment.

**Prosecution evidence**

*Renee (counts 1-3)*

Renee testified that on the evening of October 20, 2008, as she was walking along Jefferson Boulevard in the West Adams area, defendant approached in a gray or silver Volkswagen Jetta and offered her a ride. She accepted and directed him to Western Avenue, about a mile away. Defendant instead turned into a dark alley behind some apartments where he parked and told her to remove her clothes. When Renee stared at him in disbelief, defendant took a sharp object from the side of the driver's door, held it to her neck, ordered her to remove her clothes, and threatened to kill her. Frightened, she complied. Defendant then pushed Renee's head down and ordered her to place her mouth on his penis. He then ordered her to get on top of him in the driver's seat, where he placed his penis into her vagina and repeatedly said, "Bitch, don't look at me." When a car moved past them defendant hit Renee on the head, causing it to hit the steering

3

wheel, and said, "Bitch, if you say something, I'mma kill you." When defendant was finished, he ordered Renee out of the car without her clothes, but when Renee insisted on the return of her clothes and a ride back to where she was picked up, defendant agreed. Once she was dropped off, Renee called 911. In the call she described her assailant as a heavyset, bald African-American male.

Renee underwent a forensic examination by a nurse practitioner who testified that Renee's neck was very tender to the touch and she had a small scrape or tear in the tissue outside her vagina. Vaginal and other swabs as well as a blood sample were taken for DNA testing. The DNA profile obtained from sperm found on the swabs matched defendant's DNA profile. Nearly a year after the incident a detective showed Renee a six-pack photographic lineup from which she selected photograph No. 4, although she was unsure of her identification. At trial, when she learned defendant was depicted in photograph No. 3, she testified that the photograph did not resemble defendant.

### Vanessa (counts 4-6)

Vanessa, who lived with her boyfriend Vincent Phillips (Phillips) at the Adams Garden Motel, decided to go to Popeye's Chicken restaurant on Jefferson Boulevard and La Brea Avenue in the late evening of November 15, 2010. First she crossed the street to the Holiday Liquor Store and saw defendant pull up in his car. She asked for a ride and defendant agreed. Vanessa got into defendant's car, but instead of taking her to the restaurant, he drove to a secluded area where he parked, activated the child-proof locks, pulled out a gun, and told Vanessa to take off her clothes. Defendant told her to be quiet and to get on top of him while he was in the driver's seat. She complied, and after his first ejaculation, defendant pushed her off him and seemed to pass out. When Vanessa then tried to get out of the car defendant opened his eyes, ordered her to climb back on him where he kept her until he ejaculated again. When a car passed, defendant placed his hands over Vanessa's mouth and told her not to say anything. During intercourse, defendant spoke to Vanessa as though she were a willing prostitute, telling her how good her "pussy" was and asking, "Why yo' man got you out there like this?" He also told her she was not finished "until he bust about two or three nuts" (meaning to ejaculate twice).

4

Defendant later left Vanessa on Jefferson Boulevard where she flagged down a passing friend who drove her back to her motel. She and Phillips immediately went to Kaiser Hospital. When the police arrived they were transported to a rape treatment center where Vanessa underwent a forensic examination. The DNA profile obtained from the sperm found on a vaginal swab taken from Vanessa matched the DNA profile obtained from defendant.

Vanessa denied that the encounter was a commercial transaction or that she was a prostitute, although she admitted she had been "cited out" for prostitution in 2005. Vanessa also denied displaying her breast at defendant when she stopped at his car. Rather she testified that she did not offer or agree to sex for money, did not demand money from defendant, and did not threaten to "fix his ass." She admitted having no job, having been convicted in 1999, 2000, and 2005 of felony drug possession with intent to sell, and being a regular PCP user. Vanessa denied having been under the influence of PCP or other drug at the time of the rape, or that she inhaled PCP or other drug from a pipe. She did admit to taking a "hit" of some drug in order to calm down after the incident and just before going to the hospital.

Phillips testified that he and Vanessa had lived together for about one year in November 2010, and that they were still together at the time of trial. On the evening of November 15, 2010, while he was asleep, Vanessa left their motel room just before midnight to go to Popeye's. When she returned, she was hysterical and told him she had just been raped. Phillips accompanied Vanessa to the hospital and then to the rape treatment center.

Phillips claimed that he and Vanessa had a good relationship prior to incident, with no sexual problems, but afterward, she did not want him to touch her or even kiss her. She became fearful and no longer went out by herself. Phillips testified that he had never known Vanessa to sell her body, adding that she had no need to do so as he was employed as a fitness trainer, making $100 to $300 per day, and gave her money. Phillips described Vanessa as a "hustler," meaning that she was in communication with

many friends for whom she made things happen, such as helping them to obtain drugs, but he insisted she never exchanged sex for drugs.

*Linda N.*

Linda N. (Linda) testified that she had "walked the streets" as a prostitute in 1992. On April 25 of that year, however, she was merely walking home at night by herself from the grocery store when defendant approached in a car, asked whether she wanted a ride, and became persistent when she refused. She finally agreed and got into his car. Linda pointed out her house but defendant drove past it, pulled out a gun, and proceeded to a house on Second Avenue, about 10 blocks away. There he parked and took Linda to an upstairs apartment. Still holding the gun, defendant told Linda to remove her clothes or lose her life. He gave her a condom to place on his penis, required her to provide oral sex, and then laid her on the floor and had vaginal intercourse with her. Defendant then told Linda to get up, get dressed, and leave. When Linda asked him not to shoot her as she was leaving, defendant replied that he would not shoot her because he was a man of God. Linda went to the nearest phone booth and called police. When the police arrived she directed them to the apartment and told them that defendant had a gun.

Detective Kara Clifford was then a patrol officer who responded to the call and took Linda to the apartment. There Linda identified defendant as the man who had raped her. Officers arrested defendant and searched the apartment after he denied having a gun. They found a revolver which Linda identified as the gun defendant had displayed to her. Detective Clifford then took Linda to the hospital for a forensic examination.

Sometime later Linda moved to Nevada where she was employed as an assistant administrator and lived with her husband. Ashamed, Linda never told anyone other than the police about the rape until after she was contacted in June 2012 by Detective Curtis Morton. Linda testified that she did not have a knife in 1992, and that her hair was not long enough in which to hide a knife or similar object. She admitted having been arrested in 1989 for being nude in public; for domestic violence in 1992; and having been convicted of prostitution in 1990 and 1992; possession of a controlled substance with

6

intent to sell in 1998; commercial burglary in 1990 and 2002; and theft with priors in 2002.

**Defense evidence**

Beatrice Houston testified that she was defendant's hairdresser since the mid-1990's, and she had never seen defendant with a shaved head or very short hair. She claimed that defendant came into her salon for a haircut about every two months, including all of 2008, and left with his hair about one and a half inches long. She had no documentary evidence of his appointments as she had discarded all her old appointment books when she moved. Houston admitted that she refused to speak to the investigating detective because she "was for the defendant, not the prosecution."

Anthony Charles Starr (Starr) testified that he had known Vanessa for 10 or 15 years from seeing her in the neighborhood. He explained that their West Adams neighborhood was a place where "everybody know[s] everybody" and "you hang out." Vanessa lived at the Adams Motel, which had been nicknamed the "Carter" after a movie hotel that harbored drug dealers and users. Vanessa had a reputation in the neighborhood for selling things, including drugs, finding whatever people needed: "If you need something, you go to Vanessa. She'll hook you up." Starr had seen Vanessa "hanging out" at the Holiday Liquor Store, drinking, selling, and doing what she does. Starr was there almost every day, but not at the time Vanessa accepted a ride from defendant in 2010. He had seen Vanessa hail cars and get into them, but he did not know what went on inside the cars. Starr did not think that Vanessa always told the truth, but she did not try to get people in trouble.

Starr admitted a 1982 burglary conviction, a 1983 conviction for grand theft person, a 1988 robbery conviction, a 1992 forgery conviction, as well as arrests for burglary in 1984 and 1992. He admitted he was a drug user 15 years ago. He had seen many people in the neighborhood under the influence of various types of drugs, most commonly cocaine and "Sherman," a cigarette dipped in a liquid. He described the twitching and speeded up affect of people in that state.

7

Defendant testified he was 51 years old at the time of trial, had six children ranging in ages from 15 to 25, and when employed he was in unarmed security work. Defendant denied ever owning, possessing, or using a gun.

Defendant described the events involving Vanessa. He was in his car next to Holiday Liquors when he first saw her run across Adams Boulevard. She flashed a naked breast at him as she passed in front of his car, and then while leaning into the open passenger-side window she rubbed her exposed breast and she asked whether he wanted a "date." Understanding that date was a euphemism for sex for sale, he replied that he had only $10. She agreed to give him a "BJ" which means a "blow job" or oral sex. After defendant specified that he wanted to "bust two," meaning he wanted to ejaculate twice, she entered the car and directed him to an isolated cul-de-sac.

After defendant parked, Vanessa inhaled something white from a pipe and said, "Take your dick out." She then performed oral sex on him before taking off her pants and straddling him while he sat in the driver's seat. There they had sexual intercourse until he ejaculated. Vanessa then took out the pipe again, loaded it, inhaled from it, and became extremely "horny." She fondled him and again, straddled him and put his penis inside her vagina until he had a second ejaculation. When she returned to the passenger seat defendant paid her and she asked for a tip. When he reminded her that he had only $10, she became upset and said, "You're going to tip me after all of this work." She then grabbed her pants, got out of the car nearly nude, and slammed the door. Defendant denied driving her anywhere afterward.

Defendant remembered an encounter with Renee, but denied ever having had a shaved head or having owned, possessed, or driven a Jetta as described by Renee. Defendant testified that Renee flagged him down while he was driving on Hoover Street, two blocks south of Adams Boulevard, and offered to provide both oral sex and intercourse for $10. After he gave her the money, she performed the sex acts and then got out of the car.

Defendant also remembered Linda. He testified that he paid her for oral sex on four or five separate occasions. The 1992 incident was clear in his mind because on that

8

occasion she had a pocketful of drugs and did not want to remain on the street, so he took her to his father's house on Second Avenue. Once inside, defendant poured himself a drink and Linda smoked a white substance in a pipe, which she inhaled three or four times. She then took off her clothes and they had sexual intercourse. After she put her clothes back on they sat in the dining area where defendant had another drink and she smoked her pipe. Defendant gave her $30 and she asked him to take her to buy more drugs. When he refused she reached into her hair and pulled out a knife. Thinking she was going to stick him, defendant got his father's revolver from the bedroom, walked back to the living room where he set the gun on the table and said, "I think it's time for you to leave.

When the police arrived, defendant told them his version of the events and showed them where the gun was kept. The police took the gun, arrested defendant, and took both Linda and him to the police station. When defendant alerted the police that Linda had concealed a weapon in her hair a female officer took her to another location and returned with what appeared to be the same knife he had seen earlier. Both he and Linda were then booked. Defendant was detained in a cell for eight hours before being released. The gun was returned to his father.

Defendant denied ever having used force or a weapon on another person as well as ever having displayed a weapon to anyone.

During cross-examination the prosecutor played most of the recording of defendant's 35-minute interview with Detective Morton in August 2011.[2] During the interview Detective Morton showed defendant a photograph of Vanessa and asked whether he remembered offering her a ride the previous November. Defendant denied ever having seen her before and claimed that he did not remember picking up a woman and taking her to Popeye's or somewhere to have sex. He did not think it happened because he was "pretty good with faces." Defendant admitted he had been cited for soliciting prostitution years before, but claimed he currently did not pick up prostitutes or

---

[2] Initially defendant claimed he did not remember an interview with Detective Morton and that he did not recognize his voice on the CD.

strangers, and that the only prostitutes he had been with during the past few years had been provided by friends at parties. In response to Vanessa's claim that he had displayed a gun, defendant denied owning or carrying a gun except when he went shooting with his father. Defendant continued throughout the interview to deny picking up a woman, pulling a gun, or forcing a woman to have sex with him despite being confronted with the police report.

Defendant told Detective Morton that he had never been arrested for having a gun and the police had never confiscated a gun from him, although a year or two after high school he was arrested for being in a car with others who had guns. Defendant also told Detective Morton about his arrest after he had picked up a prostitute years earlier: he took her to his father's house, but told her to leave after she started "tripping"; he was then arrested after she falsely accused him of having raped her; and they were both taken to the police station and released the next morning. Defendant claimed that the woman had hidden a small knife in her hair, and that the police found it when they searched her. Defendant denied knowing whether the police had recovered a gun in the house, adding that if they did find a gun, it belonged to his father.

When cross-examination resumed after the recording stopped defendant was asked, without objection, about his prior convictions and arrests. Defendant admitted a 1981 vehicle theft conviction, a 1986 conviction of soliciting prostitution, and a 2008 conviction of possession of marijuana for sale. Defendant admitted the following arrests: for burglary in 1980; for shooting at an unoccupied dwelling in 1980; for robbery in 1981; and for rape in 1990.

On redirect examination, defendant testified he was truthful during his interview with Detective Morton. He explained that he did not recognize Vanessa until he saw her in person when she testified since he did not look at her face while having sex with her. Also the interview took place about nine months after their encounter.

Starr was recalled by the defense and testified that he had known defendant almost his entire life and had never seen him with a gun or engaged in threatening, violent, or

10

assaultive behavior as an adult. Starr added that Vanessa's nickname in the neighborhood was "Hoody Goody."

**Prosecution rebuttal**

Detective Morton testified that he had reviewed defendant's criminal history and all the crime reports relating to Renee, Vanessa, and Linda. He found nothing to indicate that Linda was arrested after the 1992 incident. The gun taken into evidence at the time of defendant's arrest in that matter was later determined to have been stolen, and would thus not have been returned to defendant or his father. Detective Morton testified that he had met with Vanessa 20 or more times and that her demeanor during her testimony was her usual spunky, rambunctious self.

Linda testified she had never seen defendant before the incident in 1992; she did not have a pocketful or a bag of drugs when he took her to his house; and she did not work the streets while under the influence of drugs, preferring to have a clear mind to conduct business. She testified that she did not have a knife in her hair that night and was not arrested or taken to the police station.

**Defense surrebuttal**

Defendant testified that Vanessa looked completely different in the photograph shown to him in his interview with Detective Morton as compared to when defendant saw her in November 2010. In person she looked "burned out" on drugs, her face was dirty, she looked awful, and was not recognizable as the same person. Defendant denied the incident happened in the interview because it happened so differently from Detective Morton's description. Defendant remembered that Vanessa had run across the street, stopped in front of his car, and flashed her breast. Defendant also repeated that he saw Linda at the police station.

## DISCUSSION

### I. Excluded evidence

Defendant contends that the trial court erroneously excluded: (1) "evidence that Vanessa C. engaged in prostitution for drugs"; and (2) "evidence that Vanessa is 'a hustler' who procured illegal drugs and acts of prostitution for people." Defendant

11

argues that the exclusion of this evidence prevented him from proving the defense theory that Vanessa engaged in prostitution to support her serious drug problem, and that his inability to prove this theory deprived him of his constitutional rights to a meaningful opportunity to present a complete defense and to confront the witnesses against him. These contentions lack merit.

Initially we note that defendant has exaggerated or mischaracterized defense counsel's offers of proof. The first offer concerned evidence of three prior narcotics convictions, not evidence that Vanessa engaged in acts of prostitution in exchange for drugs. The second offer involved Starr's understanding of the meaning of Vanessa's nickname, Hoody Goody, rather than evidence of acts of prostitution. Defense counsel told the court that Starr would testify that Hoody stood for "hood" or neighborhood, and that Goody meant Vanessa was a hustler who would get "whatever you want in the neighborhood" including sexual favors, not necessarily her own, but she could find another girl for a fee.

We also note that defendant's characterization of the excluded evidence and his single argument concerning the two separate categories of evidence offered at different times have conflated two alleged errors. The correctness of the trial court's ruling on the admission or exclusion of evidence must be reviewed as of the time it was made. (*People v. Welch* (1999) 20 Cal.4th 701, 739.) We therefore discuss each category separately, keeping in mind that "on appeal a judgment is presumed correct, and a party attacking the judgment, or any part of it, must affirmatively demonstrate prejudicial error. [Citation.]" (*People v. Garza* (2005) 35 Cal.4th 866, 881, citing *Denham v. Superior Court* (1970) 2 Cal.3d 557, 564.)

### A. Narcotics convictions

The trial court held a hearing outside the jury's presence after defense counsel sought to present evidence of Vanessa's prior convictions and arrests for use as impeachment during cross-examination. The prosecutor had no objection to evidence of Vanessa's conviction in 2000 for possession of narcotics with intent to sell or of several

of her arrests[3] but objected to three convictions in 2007 for simple possession of narcotics in violation of Health and Safety Code section 11350, subdivision (a). Defense counsel responded that the convictions were not offered for impeachment purposes, but to provide the jury with a different perception of Vanessa by showing that she was "seriously involved in drugs and that this was, in fact, her unacknowledged profession."

The trial court was not persuaded by counsel's explanation and found the evidence relevant for impeachment purposes and because the convictions were not for crimes of moral turpitude, they were excluded. The trial court acted within its broad discretion to exclude such impeachment. Unlike possession of narcotics with intent to sell, simple possession is not a crime of moral turpitude and thus has little bearing on the veracity of the witness. (*People v. Contreras* (2013) 58 Cal.4th 123, 157, fn. 24.)

The next day, the prosecutor said she intended to withdraw her objection to the three 2007 convictions if they were used solely for the purpose of impeachment. Defense counsel repeated that he did not intend to limit the use of the convictions for that purpose, but would also offer them to prove that Vanessa was a "drug-addicted prostitute." The trial court found no "legal basis for the admission of those convictions for that proposition" but told counsel that he "could ask the witness whether or not she exchanged drugs for sex."

We construe the court's language as a finding there was no relevance to proving Vanessa was a drug-addicted prostitute or that she engaged in acts of prostitution in exchange for narcotics. Only relevant evidence is admissible; and the trial court has considerable discretion to determine when evidence lacks relevance to the issue before the court. (*People v. Williams* (2008) 43 Cal.4th 584, 634.)

Relevant evidence is evidence "having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action."

---

[3]     The arrest evidence the prosecutor did not contest consisted of a 2005 arrest for a violation of Penal Code section 647, subdivision (b) (soliciting or agreeing to an act of prostitution), two arrests in 2006 and 2007 for a violation of Vehicle Code section 10851 (unlawful driving or taking a vehicle).

(Evid. Code, § 210.)[4] Defendant made no offer to prove that people convicted of simple drug possession are more likely to be prostitutes or that prostitutes tend to be convicted of simple drug possession; thus, any tendency that the convictions may have had to prove that Vanessa was a prostitute was tenuous and gave rise only to speculative inferences. The exclusion of evidence of marginal probative value is not generally an abuse of discretion, nor does it violate the constitutional right to present a defense. (*People v. Snow* (2003) 30 Cal.4th 43, 90.)

No abuse of discretion appears here, as defendant has not shown the ruling to have been arbitrary, capricious or patently absurd at the time it was made. (See *People v. Robertson* (2012) 208 Cal.App.4th 965, 991.) Nor has defendant met his burden to demonstrate prejudice amounting to a miscarriage of justice. (See *People v. Rodrigues* (1994) 8 Cal.4th 1060, 1124-1125 (*Rodrigues*).) Defendant was permitted to bring out evidence that Vanessa had worked as a prostitute after she testified that she was not a prostitute and that the incident was not a "prostitution thing." Vanessa admitted she had been "cited out" in 2005 after she got into a truck driven by an undercover officer who claimed she agreed to give him a "head job" for $18. Defendant was also permitted to present evidence of Vanessa's drug use. Vanessa admitted she had no job, had been convicted in 1999, 2000, and 2005 of drug possession with intent to sell, and that she was a regular PCP user. Although she denied that she had been under the influence of any drug at the time of the rape, she admitted that she ingested a drug just before going to the hospital. In closing argument, defense counsel pointed out that Vanessa appeared to be droopy-eyed and sleepy during her testimony, which often consisted of a foul-mouthed narrative.

Three additional minor drug charges would merely have been cumulative, which is rarely prejudicial even if erroneously excluded. (See *People v. Harris* (1989) 47 Cal.3d 1047, 1093, disapproved on other grounds, *People v. Wheeler* (1992) 4 Cal.4th 284, 299,

---

**4**     All further statutory references in sections I and II are to the Evidence Code unless otherwise indicated.

14

fn. 10 (*Wheeler*).) We cannot conclude that the exclusion of marginally relevant cumulative evidence was prejudicial here, where there was other evidence to suggest that all three victims may have been prostitutes. All three women were walking alone at night and willing to accept rides from strangers, and one of the victims, Linda, was admittedly a prostitute at the time of the attack. A jury could reasonably conclude that they were prostitutes. Indeed, this jury could have reasonably concluded that the victims were prostitutes and that defendant targeted them for that reason. We conclude beyond a reasonable doubt that the exclusion of additional evidence of drug use from which the jury could find that Vanessa was a prostitute could not have affected the verdict. Thus, had the trial court erred, any error was harmless under either the test of *People v. Watson* (1956) 46 Cal.2d 818, 836, or *Chapman v. California* (1967) 386 U.S. 18, 24.

### B. *Hoody Goody*

Defendant contends that the trial court erred in excluding evidence that Vanessa provided prostitution as part of her "hustle," and that the court's error precluded him from establishing a fact critical to his defense: "that she had engaged, and was willing to engage, in prostitution."

Both contentions are meritless. Defense counsel explained to the trial court that Starr's testimony was offered to prove that Vanessa was "a professional prostitute, . . . the fact that this is what she does, and it's a consensual act." However, Starr would have testified only that the sexual favors Vanessa was known to obtain for a client were not necessarily her own, but those of another girl. In any event, pursuant to section 1103, subdivision (c)(1), Vanessa's reputation and Starr's opinion were inadmissible to prove her consent, and the trial court properly sustained the prosecutor's objection based in part upon that ground.

If defendant intended to elicit from Starr specific instances of Vanessa's procurement of her own sexual services, he would have had to comply with the requirements of section 782, including a written motion supported by an affidavit containing the offer of proof, filed under seal. Defendant argues that he was not required to comply with section 782 or to provide a written offer of proof, because the prosecutor

did not mention defense counsel's obligation under the statute. However, even if we agreed with that position, we would find his oral offer of proof to be insufficient.

A motion to allow evidence of past sexual conduct must do more than provide evidence that the alleged victim was a prostitute; it must include sufficient facts to permit the reasonable inference that she consented to the sex act at issue. (See *People v. Casas* (1986) 181 Cal.App.3d 889, 896-897; *People v. Varona* (1983) 143 Cal.App.3d 566, 569.) For example, in *Varona*, the victim testified that she was walking to a bus stop at 11:30 p.m., in order to go home after visiting a friend when she was attacked by defendants and taken to a nearby house, raped, and subjected to forcible oral copulation. (*Id*. at p. 568.) Defendants sought to present records relating to a prior conviction which would show not just that the victim was a convicted prostitute, but also that "in the practice of that profession, she not only engaged in normal intercourse, but that she specialized in oral copulation." (*Id*. at pp. 569-570.) No facts specific to Vanessa's own sexual conduct appeared in defendant's offer of proof.

The prosecutor also cited section 352 in her objection, and we conclude that exclusion on that ground was also warranted. Like the three drug offenses, if Starr's opinion as to the meaning of the nickname Hoody Goody could be considered relevant at all, it invited only the speculative inference that Vanessa was a prostitute or had consented to sex in this case. The trial court does not abuse its discretion by excluding marginally probative evidence, nor does it violate the constitutional right to present a defense. (*People v. Snow, supra*, 30 Cal.4th at p. 90.)

Moreover, defendant was permitted to elicit evidence that Vanessa had been cited after soliciting an undercover officer. The admission of additional, marginally relevant and cumulative evidence could not have affected the verdict. Thus, for the same reasons that any error in the exclusion of the three convictions was harmless, the exclusion of Starr's opinion was equally harmless under either the test of *People v. Watson, supra*, 46 Cal.2d at page 836, or *Chapman v. California, supra*, 386 U.S. at page 24.

16

## II. Effective assistance of counsel

Defendant contends that defense counsel's representation was deficient because he did not file a written motion under section 782 or a make a sufficient offer of proof regarding the three drug convictions and "Vanessa's prior prostitution activity." Defendant also contends that defense counsel was ineffective for eliciting defendant's testimony on direct examination that he had never used force or a weapon on anyone, and then failing to object to the use of defendant's arrest history to impeach him.

The Sixth Amendment right to assistance of counsel includes the right to the effective assistance of counsel. (*Strickland v. Washington* (1984) 466 U.S. 668, 686-674; see also Cal. Const., art. I, § 15.) "Generally, a conviction will not be reversed based on a claim of ineffective assistance of counsel unless the defendant establishes *both* of the following: (1) that counsel's representation fell below an objective standard of reasonableness; *and* (2) that there is a reasonable probability that, but for counsel's unprofessional errors, a determination more favorable to defendant would have resulted. [Citations.] If the defendant makes an insufficient showing on either one of these components, the ineffective assistance claim fails." (*Rodrigues*, *supra*, 8 Cal.4th at p. 1126.) Indeed, "a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies . . . [and] that course should be followed. Courts should strive to ensure that ineffectiveness claims not become so burdensome to defense counsel that the entire criminal justice system suffers as a result." (*Strickland v. Washington*, *supra*, at p. 697; see also *People v. Hester* (2000) 22 Cal.4th 290, 297.)

### A. Failure to file section 782 motion

Defendant has made an inadequate showing of either defective representation or prejudice. Section 782 does not require a written motion to present evidence of drug convictions, and as such, a motion would have been unnecessary. Additionally, defendant has not shown that his trial counsel knew of any "prostitution activity" other than Vanessa's solicitation citation, and he has not suggested that a section 782 motion could have included any such facts. Defendant is apparently referring to Starr's opinion

that Vanessa's nickname meant that she could get "whatever you want in the neighborhood" including sexual favors, but not necessarily her own.

We have determined in the previous section that the convictions and Starr's opinion were not only improper impeachment, but they were at best, marginally probative of facts that would give rise only to speculative inferences. We concluded that a section 782 motion, without additional facts in the offer of proof, would not have been meritorious. The Sixth Amendment does not require counsel to bring unmeritorious or futile motions. (*People v. Gutierrez* (2009) 45 Cal.4th 789, 804-805.) We also concluded that the exclusion of such evidence was harmless. Thus, defendant has failed to demonstrate deficient or prejudicial representation, and his contention is without merit.

**B.  Failure to object to evidence of defendant's arrests**

Defendant contends that because defense counsel must have obtained information about defendant's arrests in pretrial discovery, it was objectively unreasonable for him to have elicited defendant's testimony on direct examination that he had never used force or a weapon on anyone. He argues that such testimony led to his impeachment with past arrests for robbery, burglary, rape, and shooting at an unoccupied dwelling, to which defense counsel unreasonably failed to object.

Ordinarily, evidence of an arrest without conviction is inadmissible. (*People v. Anderson* (1978) 20 Cal.3d 647, 650-651 (*Anderson*).) A witness may be impeached with otherwise inadmissible evidence that tends to contradict testimony given on direct examination. (*People v. Lang* (1989) 49 Cal.3d 991, 1017; § 780, subd. (i).) Mere arrests, however, are not admissible for this purpose as they are more prejudicial than probative. (*People v. Lopez* (2005) 129 Cal.App.4th 1508, 1523; cf. *People v. Medina* (1995) 11 Cal.4th 694, 769 [arrests for violent conduct not proper to rebut testimony that defendant was not violent during the same period].) It follows that mere arrests for robbery, burglary, and rape were not admissible to refute defendant's claim that he never used force against anyone, and a mere arrest for shooting at an unoccupied dwelling was not admissible to refute defendant's claim that he had never used a weapon on anyone.

18

"Failure to object rarely constitutes constitutionally ineffective legal representation. [Citation.]" (*People v. Boyette* (2002) 29 Cal.4th 381, 424.) We presume that "counsel's performance fell within the wide range of professional competence and that counsel's [omission] can be explained as a matter of sound trial strategy. Defendant thus bears the burden of establishing constitutionally inadequate assistance of counsel. [Citations.]" (*People v. Gamache* (2010) 48 Cal.4th 347, 391; *Strickland v. Washington*, *supra*, 466 U.S. at p. 687.) "If the record on appeal sheds no light on why counsel acted or failed to act in the manner challenged, an appellate claim of ineffective assistance of counsel must be rejected unless counsel was asked for an explanation and failed to provide one, or there simply could be no satisfactory explanation. [Citation.]" (*People v. Gray* (2005) 37 Cal.4th 168, 207.)

The record on appeal does not reveal exactly why defense counsel did not object to impeachment with evidence of the arrests; however, we cannot say that no satisfactory explanation is possible. The record reveals a possible reason why defense counsel elicited defendant's denials regarding weapons and force: the same denials would soon be heard by the jury in defendant's recorded interview with Detective Morton. Defendant represented to the detective that he had never had a gun before, did not carry a gun, own a gun, had never had a gun in his car, and that the police had never confiscated a gun from him. Similarly, it is possible that counsel did not object to the rape arrest because Linda had already testified regarding the details of the offense that led to that arrest.

Subject to the trial court's discretion under section 352, the facts underlying past conduct involving moral turpitude may be admissible for impeachment. (*People v. Clark* (2011) 52 Cal.4th 856, 931-932; see *Wheeler, supra*, 4 Cal.4th at pp. 290-296.) It is possible that the facts of the shooting incident and the robbery and burglary arrests would have been more damaging to the defense, which suggests a deliberate tactical decision to keep such details from the jury. Defendant had already given in his interview with Detective Morton, a seemingly innocent explanation for his shooting arrest, stating that a year or two after high school he was arrested in the company of others who had guns. The better trial strategy may have been to leave well enough alone.

Further, the record provides evidence of an agreement to allow impeachment with certain arrests. The prosecutor told the court that she agreed to the impeachment of Vanessa with an arrest for solicitation and two arrests for auto theft. As it is unlikely that experienced counsel on both sides were ignorant of the rules of evidence relating to impeachment, this suggests the possibility of some ex parte discussion between them.

In any event, defendant has not demonstrated prejudice. Impeachment with mere arrests is prejudicial where "the record reveals a close and difficult credibility determination for the jury which had to weigh divergent and conflicting factual recitations"; and it appears that "[b]ut for admission of the prior arrests, it is reasonably probable that the jury would have believed [defendant's] version of the events and rendered a more favorable verdict. [Citations.]" (*Anderson*, *supra*, 20 Cal.3d at p. 651.)

To demonstrate a close and difficult credibility determination, defendant points out that Vanessa's version conflicted with his, the DNA results as to Vanessa and Renee were not inconsistent with consensual sex, and there was evidence that Renee misidentified defendant in that she failed to identify defendant's photograph and she described his hair as shaved. Defendant also argues that Vanessa's lack of credibility adversely affected the credibility of Renee and Linda.

Contrary to defendant's arguments, a review of all the evidence reveals overwhelming evidence of defendant's guilt that left no close or difficult credibility determination. The three women described similar incidents: walking alone at night in defendant's neighborhood, accepting a ride from a man whom all three women identified in court as defendant, who took them to a secluded place, used a weapon and threats to subdue them, and demanded oral sex and then vaginal intercourse. The experiences of two of the women were similar: Vanessa and Linda were both drug users; defendant took them into a secluded street or alley and placed them in a constricted position between defendant and a steering wheel; he told them to remain quiet; he forced them from the car afterward; and defendant's DNA was found in them. Renee suffered injuries to her neck and genital tissue, providing additional evidence of force.

20

The experience of the three women served to corroborate one another, and far from discrediting the testimony of Renee and Linda, the factors which served to damage Vanessa's credibility provided compelling evidence of a modus operandi by which defendant would target women who may have appeared to be prostitutes. Vanessa's hustling, drug use, solicitation arrest, and her request for a ride from defendant all support the conclusion that she was a prostitute. Defendant spoke to her as though he were a client and asked, "Why yo' man got you out there like this?" Defendant admitted at trial that Vanessa appeared to him to be under the influence of drugs when she approached him at Holiday Liquor.

Moreover, quite apart from the arrests, defendant's credibility suffered damage from evidence to which defendant does not claim defense counsel should have objected: defendant's convictions for vehicle theft and possession of marijuana for sale. In addition, defendant's false statements to Detective Morton provided cogent evidence of his consciousness of guilt and suggested that his explanation for the incriminating circumstances was not an honest one. (See *People v. Kimble* (1988) 44 Cal.3d 480, 496.) In the interview defendant repeatedly denied ever having seen Vanessa, giving rides to strangers or picking up prostitutes in recent years, or picking up *any* woman at the Holiday Liquor Store. At trial however, defendant admitted his encounter with Vanessa, adding the implausible explanation that because Detective Morton had failed to add the breast-flashing detail and Vanessa did not resemble the photograph he was shown in the interview he did not think he was identifying the same incident. In the interview, defendant also denied having pulled a gun on Vanessa, ever owning or carrying a gun, or ever having a gun confiscated from him by the police. At trial, he admitted he placed a revolver on the table near Linda to encourage her to leave the apartment and admitted that the revolver was turned over to police.

Defendant's credibility was also damaged by the testimony of Detectives Morton and Clifford. At trial defendant testified that when he was arrested for the incident involving Linda, the police detained her and confiscated a knife that she had hidden in her hair. After reviewing the crime reports of the incident, Detective Morton testified

21

that none showed that Linda was arrested. Detective Clifford testified that she took Linda from the scene of the incident to the hospital without searching her. No knife was found or booked into evidence.

Finally, defendant's own witnesses failed to bolster his credibility. Defendant's hairdresser was admittedly biased in his favor, brought nothing to court to support her claim of regular appointments with defendant, or that she ever owned a salon; and no friend or relative appeared to testify regarding the length of defendant's hair at any given time. Starr, called by the defense to testify regarding Vanessa's reputation in the neighborhood, reported that Vanessa lied on occasion but did not try to get people in trouble.

Given all these circumstances the jury was not presented with a close or difficult credibility determination and we cannot conclude that "[b]ut for admission of the prior arrests, it is reasonably probable that the jury would have believed [defendant's] version of the events and rendered a more favorable verdict. [Citations.]" (*Anderson, supra*, 20 Cal.3d at p. 651.) We conclude that even if counsel's performance was deficient, defendant has failed to sustain his burden to show prejudice, and his ineffective assistance claim thus fails. (See *In re Alvernaz* (1992) 2 Cal.4th 924, 945.)

### III. Habeas corpus petition

The petition alleges that defense counsel's performance was deficient in the following respects: (1) he failed to file an Evidence Code section 782 motion or make an adequate offer of proof to support such a motion; (2) he failed to present Department of Motor Vehicle (DMV) records to show that defendant owned a car that was not a Volkswagen Jetta, in order to impeach Renee's claim that he drove a Jetta when he attacked her; (3) he failed to object to the evidence of defendant's prior arrests; and (4) he elicited defendant's testimony that the gun displayed to Linda was returned to his father, although counsel had copies of police records showing that the gun had been stolen.

"Because a petition for a writ of habeas corpus seeks to collaterally attack a presumptively final criminal judgment, the petitioner bears a heavy burden initially to *plead* sufficient grounds for relief . . . ." (*People v. Duvall* (1995) 9 Cal.4th 464, 474.)

An appellate court reviewing such petition will issue an order to show cause only when the allegations, if true, would establish a prima facie case for relief. (*Id*. at pp. 474-475.) To carry his burden to establish a prima facie case based on ineffective assistance of counsel, the petitioner must allege facts showing a reasonable probability that but for counsel's error the result would have been different. (*People v. Hester, supra*, 22 Cal.4th at p. 297.)

Other than the allegation that counsel failed to obtain DMV records, defendant raised the same claim of errors in his appeal which we have already found to be harmless. We observe that neither the inaccuracy of Renee's belief as to the make and model of the car nor the identity of the car defendant actually owned would go far in proving that defendant was not the driver of the car in which Renee was raped. Further, the failure to obtain defendant's car registration, the remaining allegations of the petition, and the supporting declarations are all facts relating only to deficiencies in counsel's performance. There are no allegations in the petition regarding the issue of prejudice. Indeed, neither defendant nor counsel claims that he would have proceeded differently.

Assuming the truth of the allegations, we conclude they fail to establish any reasonable probability that but for counsel's alleged errors the result might have been different. Thus defendant has failed to establish a prima facie case of prejudicially ineffective representation by counsel. (See *In re Alvernaz, supra*, 2 Cal.4th at p. 945.)

## DISPOSITION

The judgment is affirmed. The petition for writ of habeas corpus is denied.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.

_____, J.
CHAVEZ

We concur:

_____, P. J.        _____, J.
BOREN                                          ASHMANN-GERST

23